UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE CYTYC CORP.                          CIVIL ACTION NO.
SECURITIES LITIGATION                      02-12399-NMG


**REPORT AND RECOMMENDATION RE:
DEFENDANTS' MOTION TO DISMISS THE CORRECTED
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
(DOCKET ENTRY # 30)**

**March 1, 2005**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to dismiss (Docket Entry # 30) filed in this consolidated class action by defendants Cytyc Corporation ("Cytyc"), Patrick Sullivan ("Sullivan"), Cytyc's President and Chief Executive Officer throughout the class period,[1] and Robert Bowen ("Bowen"), Cytyc's Chief Financial Officer and Vice President throughout the class period. After conducting a hearing, this court took the motion (Docket Entry # 30) under advisement.


PROCEDURAL BACKGROUND

The gravamen of the corrected amended complaint (henceforth: "the complaint") (Docket Entry # 27) filed by lead plaintiffs Plumbers and Pipefitters National Pension Fund and Deka Investment GMBH ("plaintiffs") is that Sullivan and Bowen ("the individual defendants") and Cytyc, a company that produces and manufactures medical devices that screen for cervical and breast

---

[1]  Sullivan also took on the role of Chairman of the Board of Directors on November 20, 2001, a role he maintained throughout the remainder of the class period.

cancers, engaged in channel stuffing throughout the class period (July 25, 2001 to June 25, 2002).  Channel stuffing is the practice of "inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company."  Greebel v. FP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999).  It has "the result of shifting earnings into earlier quarters, quite likely to the detriment of earnings in later quarters."  Greebel v. FP Software, Inc., 194 F.3d at 202.

The channel stuffing, which purportedly occurred at the end of each quarter, concerned Cytyc's principal product, the ThinPrep system ("ThinPrep").  ThinPrep competes with the more traditional Pap smear test as a means of screening women for cervical cancer.

Plaintiffs submit that the individual defendants and Cytyc (collectively:  "defendants") failed to disclose or only partially disclosed the channel stuffing during the class period. Statements made by Sullivan, various third parties or contained in the company's SEC filings were false or materially misleading regarding the deep discounts that Cytyc offered customers near the end of every quarter.  As a result, reported revenues, earnings and market share were artificially inflated.  Defendants thereby mislead investors about earnings and the reasons for the company's growth and increased sales.  In addition, defendants violated the company's internal revenue recognition policy, SEC regulations and generally acceptable accounting principles

("GAAP") by shipping unordered product to customers and engaging in channel stuffing.

The two count, 62 page complaint, which includes 187 paragraphs, alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Defendants move to dismiss the complaint under Rule 12(b)(6), Fed. R. Civ. P. ("Rule 12(b)(6)"), for failing to plead fraud with particularity under Rule 9(b), Fed. R. Civ. P. ("Rule 9(b)"), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  Defendants additionally seek dismissal on the basis that the statements are inactionable corporate puffery, neither false or misleading, not material and lack the necessary strong inference of scienter.  Defendants also rely on the safe harbor provision of the PSLRA pertaining to forward looking statements. See 15 U.S.C. § 78u-5(c)(1)(A)(i); 17 C.F.R. § 240.3b-6.

<u>STANDARD OF REVIEW</u>

In reviewing the motion to dismiss, this court accepts the factual allegations in the complaint as true and draws all reasonable inferences in favor of plaintiffs.  <u>See Alternative Energy v. St. Paul Fire & Marine</u>, 267 F.3d 30, 33 (1st Cir. 2001) (on motion to dismiss, court accepts all allegations in complaint as true and construes "all reasonable inferences in favor of the plaintiffs").  Without crediting unsubstantiated conclusions, <u>Rodi v. Southern New England School of Law</u>, 389 F.3d 5, 10 (1st

Cir. 2004) (ignoring "'bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, [and] outright vituperation'"), dismissal is appropriate "only if it 'appears to a certainty that the plaintiff would be unable to recover under any set of facts.'"  State Street Bank and Trust Company v. Denman Tire Corporation, 240 F.3d 83, 87 (1st Cir. 2001); accord Blackstone Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001) (dismissal proper "only if, under the facts alleged," plaintiffs "cannot recover on any viable theory;" internal quotation marks omitted).

The pleading standards under the PSLRA do not alter this standard of review.  Aldridge v. A.T. Cross Corporation, 284 F.3d 72, 78 (1st Cir. 2002).  Facts, drawn primarily from the complaint as well as certain public and integral documents referred to in the complaint,[2] are as follows.

---

[2]   In Re Stone & Webster, 253 F.Supp.2d 102, 128 & n. 11 (D.Mass. 2003) (considering copies of SEC Forms 4 without converting motion to dismiss into motion for summary judgment); In Re Millstone Scientific Securities Litigation, 103 F.Supp.2d 425, 450-451 & n. 15 (D.N.J. 2000); see Alternative Energy v. St. Paul Fire and Marine, 267 F.3d 30, 33-34 (1st Cir. 2001); Blackstone Realty, LLC v. FDIC, 244 F.3d at 195 n. 1 (exhibits attached to complaint properly considered for purposes of Rule 12(b)(6)); Shaw v. Digital Equipment Corporation, 82 F.3d 1194, 1206 n. 13 & 1220 (1st Cir. 1996) (inasmuch as complaint alleged nondisclosure in registration statement and prospectus, court may examine text of filings and any incorporated SEC filings); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d 206, 213 n. 7 (D.Mass. 2001) (considering "full text of the Form 10-Q," including "parts not relied on by the plaintiffs," on a motion to dismiss inasmuch as complaint refers to the document); see also Clorox Company Puerto Rico v. Proctor & Gamble, 228 F.3d 24, 32 (1st Cir. 2000) ("'when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations'").

BACKGROUND

Cytyc develops, manufactures and markets the sample preparation system known as ThinPrep.  ThinPrep is an automated system for preparing cervical cell specimens on microscope slides.  In May 1996, Cytyc received premarket approval from the Food and Drug Administration ("FDA") to market ThinPrep as a screening system for cervical cancer.  The product directly competes with the conventional Pap smear test.  In November 1996, the FDA allowed Cytyc to label and market ThinPrep as "significantly more effective in detecting cervical cancer than the Pap smear."  (¶ 34).[3]

The company, which has a plant in Boxborough, Massachusetts, began selling ThinPrep nationwide in 1997.  It is the company's chief or principal product.  In September 1997, the FDA gave Cytyc premarket approval to use specimen collected in ThinPrep solution to test for the presence of the human papillomavirus. The company markets ThinPrep to healthcare providers, insurance companies and clinical laboratories.  In 1998, it began marketing ThinPrep selectively overseas in international markets.

Net sales for the year ending in December 2000 reached $142,337,000 before the start of the class period.  Cytyc's reported share of the cervical testing market prior to the class period ranged from 50% to 60%.

---

[3]   Unless otherwise noted, citations to paragraphs only refer to paragraphs in the complaint, Docket Entry Number 27.

A.  <u>Customer Complaints, Discounts and Unordered Products</u>

According to an unnamed, former medical and sales representative ("Cytyc sales representative"), "Beginning in at least 1999, . . . Cytyc 'typically engaged in channel stuffing at the end of each quarter.'"  (¶ 38).  This sales representative dealt directly with physicians concerning ThinPrep and describes, in general terms, that "Cytyc overloaded laboratories with inventory" in order to drive up profitability and sales.  (¶ 38).  With slightly greater specifically, he or she identifies Onco, located in Gaithersburg, Maryland as "a frequent victim of Cytyc's channel stuffing."[4]  (¶ 47).  Also according to this sales representative, certain unidentified "Cytyc account executives" told him or her that "Cytyc occasionally sent merchandise to laboratories, despite requests from those customers to refrain from shipping any more product."  (¶ 49).

An unnamed former managed care executive ("Cytyc managed care executive") who dealt directly with laboratories and physicians states that, Cytyc offered special discounts to customers "towards the end of each quarter."  (¶ 50).  He or she does not identify the customer, the amount of the discount or the relationship of the amount shipped to Cytyc's revenues.  Instead, the managed care executive posits that if a customer, again unidentified, "needed only one thousand tests a month, the customer still knew that if it took three thousand tests in the

---

[4]  The representative does not provide any additional detail such as the amount of product stuffed and the dates of the shipments.

last month of a quarter, Cytyc would offer a much bigger discount."  (¶ 50).

Another unnamed, former regional sales manager who became a senior representative ("Cytyc senior representative") and dealt directly with customers in six western states describes that, "from at least July 1999, Cytyc shipped additional product to its customers, above what had been ordered" until the customer complained that it had too much inventory.[5]  (¶ 44).  Labcorp was one of the Cytyc customers that complained to the Cytyc senior representative about the company's sales practices.[6]  (¶ 49).

A former Cytyc account executive who covered the northwest region ("Cytyc NW account executive") and had direct customer contact relates that customers complained about storing the excess product on "pallets in their hallways."[7]  (¶ 43). Likewise, an unnamed, former Cytyc electrotechnical technician ("Cytyc technician") relates, again at an undetermined time and in an undetermined amount, seeing "stockpiles of inventory lying unused" when he visited customers in the New England region to fix technical problems.  (¶ 51).

---

[5]  The complaint does not identify when these shipments occurred, the amount and the amount's relation to Cytyc's overall business.  There is no indication that the shipments were returned.

[6]  The complaint does not attribute this assertion to a particular individual.  The source of the statement is thus unknown.  There is also no indication when the complaint[s] occurred or the amount of the shipment[s] involved.

[7]  Again, no detail is provided regarding the identity of the customers and when and how much pallet storing occurred.

Another former, unnamed Cytyc account executive for California ("Cytyc CA account executive") notes that in December 2000, Cytyc shipped the Palo Alto Medical Foundation ("Palo Alto Medical") "a year's worth of product without having received an order to do so."[8]  (¶ 45).  There is no indication that Palo Alto returned the shipment.  It was, however, given a 50% discount, which exceeded the typical 20% end of quarter discount.[9]

The Cytyc CA account executive also identifies Stockton Pathology, located in Stockton, California, as receiving "six months' worth of product," albeit at an unidentified time. Although not returned,[10] the excess product "lay unused, piled floor-to-ceiling in the customer's offices."  (¶ 45).   At an undetermined time, "Stanford University Hospital and Marin Pathology cancelled their agreements with Cytyc because they were fed up with being shipped unwanted merchandise," according to this executive.  (¶ 157).

"Management" encouraged channel stuffing to meet unrealistic quarterly quotas, according to the Cytyc CA account executive. (¶¶ 46 & 47).  Channel stuffing occurred at the end of every quarter, according to both this executive and the Cytyc managed

---

[8]  A "year's worth" of ThinPrep would, of course, extend into the class period which began in June 2001.

[9]  The complaint fails to articulate the amount of the shipped product discounted and/or the relation to Cytyc's overall revenues.

[10]  Although not expressly stated in the complaint, this is the only reasonable inference inasmuch as the complaint depicts how the excess product lay unused at the customer's offices.

care executive (¶¶ 111 & 123) and was well known in the company (¶ 150).  During the last quarter of 2001, the company increased its channel stuffing practices by offering "extra incentives" to customers and created a "'war room'" to field the daily telephone calls from sales representatives giving updates of sales figures, according to an unnamed human resources representative at Cytyc who describes Sullivan and Bowen as "very involved" in daily management.[11]  (¶¶ 40 & 101).  As a result of the channel stuffing, the market share described to analysts by Sullivan and other management officials was allegedly overstated.  (¶ 47).

Cytyc disclosed the use of discounts in the December 2000 Form 10-K annual report, signed by Sullivan and Bowen, in the following terms:

> The Company's success and growth will depend on market acceptance of the ThinPrep System among healthcare providers, third-party payors and clinical laboratories. The Company will continue to sell the ThinPrep Processor to customers and charge separately for related disposable reagent filters and supplies.  *In the past, the Company has offered discounts to stimulate demand for the ThinPrep System and may elect to do so in the future, which discounts could have a material adverse effect on the Company's business, financial condition and results of operations.*

(Docket Entry # 32, Ex. B, p. 8; emphasis supplied).  Cytyc repeated this disclosure in the company's 2001 Form 10-K annual

---

[11]  The company was highly focused on meeting the sales quotas which were "set by Cytyc's management" (¶ 153) and, according to an unnamed manufacturing manager ("Cytyc manufacturing manager"), top executives met frequently with employees "to discuss sales strategies."  (¶ 39).  Cytyc senior management also closely managed the everyday business of Cytyc and attended meetings with the salesforce.  (¶¶ 41 & 150).

report.[12]   (Docket Entry # 32, Ex. J, pp. 8-9).

Cytyc also shipped "significant" amounts of "additional product" above and beyond what customers ordered.  (¶ 61).  As noted above, Cytyc's senior representative describes shipments of unknown quantities of ThinPrep to unknown customers "from at least July 1999."  (¶ 44).  At Cytyc, shipping more product than ordered to increase sales occurred near the end of the financial reporting periods.  (¶¶ 5 & 7; see also ¶ 49).

B.   Specific Company Statements During Class Period

    1.   July 25, 2001 Press Release

At the outset of the class period on July 25, 2001, Cytyc's stock was trading for $24.79.  (¶ 9).  On that day, Cytyc issued a press release reporting "record" revenue and earnings for the second quarter of 2001.  (Docket Entry # 32, Ex. A).  The release accurately reported $52,997,000 of revenue for the quarter or net income of $.13 per diluted share.[13]  (¶ 67; Docket Entry # 32, Ex. D, p. 4; Docket Entry # 32, Ex. J, p. F-22).

Plaintiffs take issue with the following statements, the first historical and the others forward looking, made by Sullivan

---

[12]   Like the 2000 Form 10-K annual report, the 2001 Form 10-K annual report discloses that, "In the past, the Company has offered discounts to stimulate demand for the ThinPrep System and may elect to do so in the future, which discounts could have a material adverse effect on the Company's business, financial condition and results of operations."  (Docket Entry # 32, Ex. J, pp. 8-9).

[13]   There is no indication that these numbers were subsequently restated.  (Docket Entry # 32, Ex. J, p. F-22).

in the press release:[14]

> "We are pleased to report record revenues and earnings," said Patrick Sullivan, Cytyc's president and chief executive officer.  "In addition, we increased our U.S. market share by five percentage points for the second consecutive quarter.  Our U.S. market share has grown substantially to approximately 46 percent at June 30 from 36 percent at the end of 2000, and we expect to exceed 50 percent domestic market conversion by year-end.  *This growth has been driven by the combination of our proven marketing strategy, best-in-class sales team, and superior technology.*"
>
> In conclusion, Mr. Sullivan stated, "As Cytyc continues to achieve record results in the marketplace, I am confident in our ability to *continue the momentum established in the first half of the year.*  We look forward to *continuing our consistent quarter to quarter growth* and *delivering a record financial performance* for 2001."

(¶¶ 67 & 69-70; emphasis in complaint).  Defendants purportedly knew that the stated reasons ("proven marketing strategy, best-in-class sales team, and superior technology") were not the real reasons for the historical growth.  Instead, the real reasons were the channel stuffing of products at the end of every quarter and the shipments of unordered product.  Cytyc then improperly recognized the revenue on these products at the expense of future sales and in contravention of the company's stated revenue recognition policy, GAAP and SEC rules.  (¶ 68).

With respect to the forward looking statements, plaintiffs submit that defendants knew that the "momentum" and "consistent quarter to quarter growth" were the result of channel stuffing, including the steep, end-of-quarter discounts, and that the momentum could not continue without continuing the channel

---

[14]  The press release was relatively short, consisting of two pages of text and two pages of a company balance sheet.

stuffing practices.  (¶¶ 69-70).  It is worth noting, however, that the relatively short press release contains the following cautionary language:

> Investors are cautioned that statements in this press release which are not strictly historical statements, including, without limitation, statements regarding management's expectations for future growth, profitability, and objectives for future management and operations, as well as statements regarding the management and operations . . . constitute forward-looking statements which involve risks and uncertainties which could cause actual results to differ, including, without limitation, risks associated with the Company's dependence on a single product, uncertainty of market acceptance and additional cost, dependence on proprietary technology, dependence on timely and adequate levels of third-party reimbursement, dependence on key personnel, management of growth, limited marketing, sales, and private equity investment experience, and limited number of customers and lengthy sales cycle . . . and other risks detailed in the Company's filings with the Securities and Exchange Commission, including under the heading "Certain Factors Which May Affect Future Results" in its 2000 Form 10-K filed with the Commission.

(Docket Entry # 32, Ex. A).  The language in the Form 10-K under the referenced caption provides added detail about the above risk factors.  Regarding the "Limited Marketing and Sales Experience" factor, the Form 10-K warns that:

> No assurance can be given that the Company's direct sales force or strategic marketing relationships will succeed in promoting the ThinPrep System to healthcare providers, third-party payors or clinical laboratories, or that additional marketing and sales channels will be successfully established . . . Failure to successfully expand its marketing and sales capabilities in the United States . . . would have a material adverse effect on the Company's business, financial condition and results of operations.

(Docket Entry # 32, Ex. B).  With respect to the "Limited Number of Customers and Lengthy Sales Process" factor, the Form 10-K explicitly states that, "Due in part to a recent trend toward consolidation of clinical laboratories, the Company expects that

12

the number of potential domestic customers for its products will decrease."  (Docket Entry # 32, Ex. B).

The press release notes that management would discuss the results and future expectations at a 5:00 p.m. conference call later that day.  After the conference call, accessed by the public through the company's website, analysts projected the company's market share as soon reaching 50%.  (¶ 72).

2.  <u>Bloomberg News Interview August 2, 2001</u>

On August 2, 2001, Bloomberg News interviewed Sullivan and published a transcript of the interview.  Whereas on July 25, 2001, Sullivan attributed past growth as driven by the company's "proven market strategy" and "sales team," he forecasted that similar factors of the company's "unique sales and marketing strategy" would allow the company to increase its market share in the future.  (¶ 73).  Referring to the July 25, 2001 conference call, he projected annual revenues in 2001 as between $210,000,000 and $220,000,000 and between $275,000,000 and $300,000,000 for the following year.

The text of the interview reads, in pertinent part, as follows:[15]

> [Bloomberg News]:  Mr. Sullivan, taking a look at your revenue numbers, this past quarter, they grew at 12% sequentially and they were up about 60% from a year ago. *Can you maintain that kind of growth in terms of revenue?*
>
> Sullivan:  *We believe so*.  If you look at the market opportunity.  We believe we're getting started and hitting our stride.  In the sweet spot of the curve.  If you look at the 50 million Pap smears, it represents for us about a $500

---

[15]  Punctuation is taken from the transcript.

million to $700 million market opportunity.

[Bloomberg News]:  *Well, how will you increase, though market share and be aggressive in gaining market share [in] this?*

Sullivan:  *We have a unique sales and marketing strategy in that we have a direct sales force that calls on the OB/GYN's who perform the procedure in their office.  In addition we have a sales force calling on the laboratory.  It is creating the demand at the physician's office*.  And we have also started some direct consumer advertising campaigns . . .

[Bloomberg News]:  *Give investors some sort of landmarks that they should sort of watch out for or milestones, if you will that they should watch for from your company over the next six to eight months to see that you're certainly on track in terms of exceeding or meeting your growth goals?*

Sullivan:  Well, *we've guided the street in our conference call* that we believe we're going to finish this year somewhere between $210 million and $220 million in top line revenue, [we] believe that we will be at the top end of that range.  Next year we expect to be in the $275 million to $300 million range.  In addition we have these additional products that we're currently working on that we expect to have completed by the end of this year.[16]

(¶¶ 73 & 75, emphasis in complaint; Docket Entry # 32, Ex. C).

### 3.  August 8, 2001 Second Quarter Form 10-Q

On August 8, 2001, Cytyc issued the Form 10-Q for the quarter ending June 30, 2001.  All defendants, including Bowen, signed the form.  The form reflects the following method for recognizing revenue:

---

[16]  Like the July 25, 2001 statements, defendants submit that the statements are corporate puffery and do not denote marketing strategy and the sales force as the only factors effecting growth.  They also maintain that the projections, which reference the conference call, were not material inasmuch as they did not alter the total mix of information available to the investing public.  Plaintiffs characterize Sullivan's stated reasons as false and materially misleading inasmuch as channel stuffing was and would continue to have an adverse impact on future sales.

14

> The Company recognizes product revenue upon shipment, provided that there is persuasive evidence of an arrangement, there are no uncertainties regarding acceptance, the sales price is fixed or determinable, collection of the resulting receivable is probable and only perfunctory Company obligations included in the arrangement remain to be completed.

(¶¶ 58 & 78; accord Docket Entry # 32, Ex. B & J, pp. F-7). Cytyc therefore recognized revenue upon shipment.[17]

This second quarter Form 10-Q for 2001 portrays net sales of $100,464,000, an increase from the $62,303,000 reported during the corresponding period in 2000.  The Form 10-Q advises that certain factors may affect future results, refers to additional factors disclosed in the Form 10-K for 2000 and cautions that, "past financial performance should not be considered an indiction of future performance."  (Docket Entry # 32, Ex. D, p. 13).

In describing the company's liquidity and capital resources, the form notes that, "Net inventories decreased approximately $1.3 million during the six months ended June 30, 2001 primarily due to improved inventory management and production control."  (¶ 81; Docket Entry # 32, Ex. D, p. 11).  The release of the August 8, 2001 Form 10-Q caused a one day increase in the price of Cytyc stock from $24.20 to $25.90.

4.   October 19, 2001 Boston Herald Article

On October 18, 2001, Cytyc announced that it would acquire Pro-Duct Health, Inc. ("Pro-Duct"), a private company that makes

---

[17]   As explained in greater length infra, plaintiffs allege that Cytyc departed from this stated policy by recognizing the revenue upon shipping the unordered product and by offering the deep discounts offered customers at the end of every quarter or otherwise engaging in channel stuffing.  (¶ 79).

a breast cancer screening device, for $38,000,000 in cash and 5,000,000 shares of Cytyc common stock.  Sullivan described the acquisition as an "ideal fit" with "an annual potential U.S. market of $1.5 billion, growing to $4.0 billion."  (¶ 84).  The acquisition was scheduled to close and did close in the fourth quarter of 2001.  Cytyc's stock increased from $25.79 on October 17 to $26.55 on October 18, 2001.  (¶ 84; Docket Entry # 32, Ex. E).

On October 19, 2001, the Boston Herald ran an article quoting Sullivan as saying, "'*We feel confident in our success based on our track record with the ThinPrep Pap Smear, which has made this acquisition possible.*'"[18]  (¶ 87, emphasis in complaint; Docket Entry # 32, Ex. E).  Cytyc stock closed at $28.03 on October 19, 2001.  (¶ 86).

    5.  <u>October 24, 2001 Press Release</u>

On October 24, 2001, Cytyc issued a press release reporting record revenues for the third quarter of 2001.  Third quarter revenue "was $57.2 million, . . . a 54 percent increase from the $37 million reported in the comparable quarter last year."[19]  (¶

---

[18]  Plaintiffs describe the statement as misleading because it omits the fact that Cytyc's "track record" is based upon undisclosed channel stuffing.  Plaintiffs also point out that Cytyc's stock would have been worthless and the acquisition therefore costlier if the company had not artificially inflated the company's stock through channel stuffing.  (Docket Entry # 36).  Defendants, in turn, assert that the statement amounts to inactionable corporate puffery and there is no connection between the statement, i.e., the efficacy of ThinPrep, and the omitted information of channel stuffing.

[19]  The Form 10-K for 2001, released in March 2002, reflects these same figures.  (Docket Entry # 32, Ex. J, p. F-22).

89; Docket Entry # 32, Ex. F).  Sullivan glowingly described the Pro-Duct acquisition as "'provid[ing] an excellent opportunity for significant revenue and earnings growth.'"  (¶ 89; Docket Entry # 32, Ex. F).

Plaintiffs take issue with Sullivan's historical description of the company's consistent revenue growth as emanating from "'*the effectiveness of [Cytyc's] sales and marketing strategy.*'"[20]  (¶ 89, emphasis in complaint; Docket Entry # 32, Ex. F).  According to the complaint, the statement is misleading because the reported growth arose from the "systemic and continuous channel stuffing" as well as shipping unordered products to customers, a practice that alienated such customers and caused them to cease doing business with Cytyc.  (¶ 90). Further, Cytyc did not experience "consistent revenue and earnings growth" because the Cytyc sales and marketing strategy of channel stuffing pushed sales into earlier quarters at the expense of later periods.  (¶ 91).

---

[20]  The complete statement in the press release is as follows:

> "We believe the superior clinical performance of the ThinPrep Pap Test and *the effectiveness of our sales and marketing strategy have provided Cytyc with consistent revenue and earnings growth and financial performance*," said Patrick Sullivan, Cytyc's president and chief executive officer.  "Last week we announced that Cytyc has entered into a definitive merger agreement to acquire Pro-Duct Health, Inc., an acquisition that we expect will expand our product line to include breast cancer and provide an excellent opportunity for significant revenue and earnings growth."

(¶ 89, emphasis in complaint; Docket Entry # 32, Ex. F).

17

6.   January 14, 2002 Press Release

On January 14, 2002, Cytyc issued a press release reiterating the company's comfort level with the estimate of "approximately $0.13 per diluted share" for the 2001 fourth quarter and "approximately $0.45 per diluted share" for the full year.   (¶ 95; Docket Entry # 32, Ex. G).   Cytyc also forecasted 2002 per share earnings as "approximately $0.64 to $0.66."   (¶ 95; Docket Entry # 32, Ex. G).   The latter forecast did not materialize.

Like the July 25, 2001 press release, the January 14, 2002 press release cautions investors not to rely on the forecasts and that current expectations "are subject to risks and uncertainties which could cause the outcomes to differ materially from [the forward-looking] statements."   (Docket Entry # 32, Ex. G).   The press release identifies various risk factors and refers investors to the company's SEC filings.

The complaint depicts the falsity of the statements insofar as the revenue numbers, inflated because of the company's channel stuffing practices, contravene the company's stated revenue recognition policy as well as GAAP and SEC rules.   (¶ 100).

7.   January 23, 2002 Press Release

On January 23, 2002, Cytyc announced "record" revenues for the 2001 fourth quarter and for the year.   The press release shows revenues "of $63 million for the quarter" representing a "49% increase over the fourth quarter 2000 revenues, and" net income of $0.13 per share.   (¶ 96).   Revenues grew to $221

18

million for the year.  (¶ 96).  As set forth in the complaint, these earnings include ThinPrep sales resulting from the channel stuffing and shipments of unordered product thereby violating the company's stated revenue recognition policy, GAAP and SEC rules. (¶ 100).

The complaint highlights and complains about two statements, the first being historical and the second forward looking, that Sullivan made in the press release.  The statements, italicized below, are as follows:

> "This was an outstanding year for Cytyc Corporation," said Patrick Sullivan, Cytyc's president and chief executive officer.  "*We have now reported fifteen consecutive quarters of revenue growth.*  In addition, we acquired Pro-Duct Health, expanding our product line to include breast cancer risk assessment."  Mr. Sullivan continued, "We believe the success of the company was further demonstrated by Cytyc's recent addition to the S & P Midcap 400 Index and The Nasdaq-100 Index."  Mr. Sullivan concluded, "*We believe the achievements of 2001 put Cytyc in a solid position to build on the momentum of the past year* and the success of ThinPrep(R) System, to continue domestic and international market conversion to the ThinPrep(R) PapTest(TM), and to launch Cytyc's ductal lavage procedure for patients at high risk for breast cancer."

(¶ 96, emphasis in complaint).

As the complaint alleges, plaintiffs submit that the first statement is misleading and false because Cytyc achieved the historical growth by resort to undisclosed channel stuffing.[21] (¶ 100).  Again, the reported growth improperly includes sales from the channel stuffing at the end of each quarter and the shipments of unordered products.  (¶ 100).  In light of this

---

[21]   Plaintiffs do not take issue with the veracity of the numbers as reflecting what Cytyc achieved.  (Docket Entry # 36).

19

improper revenue recognition, the assertion that Cytyc was "'in a solid position'" to build upon previous "'momentum'" was false and misleading.  (¶ 100).  The press release contains cautionary statements similar to those in previous press releases.

    8.   <u>Bloomberg News Interview January 24, 2002</u>

The day after the January 23, 2002 press release, Bloomberg News interviewed Sullivan about the reported fourth quarter profits.  Without referring to the January 23, 2002 press release or the cautionary statements therein, Sullivan forecasted revenues "'in the $295 to $305 million range'" and an increase in earnings per share to "'between 64 and 66 cents.'"[22]  (¶ 99).

---

[22]   Defendants submit that the complaint fails to identify which remarks in the interview are false.  To the contrary, however, paragraph 99 not only quotes the above forecast but also repeats the forecast by stating that, "Sullivan raised Cytyc's expected revenues for 2002 to between $295 million-$305 million, up from the $275 million-$300 million range originally given on August 2, 2001."  (¶ 99).  The next paragraph alleges that, "Defendants knew that the statements in paragraphs 95-97, 99, were false."  (¶ 100).  Defendants' additional challenge that the forecast is inactionable puffery (Docket Entry # 39, n. 3, referring to "the January 24, 2002 press release [sic]") is unavailing given the explicit nature of the forecast.  The statement, to the extent based on a current projection, provides the revenue range and expected earnings per share for the time frame of one year.

As explained <u>infra</u> with respect to the August 2, 2001 projection and argued in general by defendants in their memorandum (Docket Entry # 31, p. 39) and at the hearing, however, the complaint fails to show sufficient facts to support the information and belief that Sullivan knew the forecast was either false or materially misleading.  Neither the opinion by the former human resources employee (¶ 154) nor his or her characterization of Sullivan and Bowen as "'hands-on'" managers (¶ 40) is enough.  As to materiality, disclosing the use of discounts as effecting the projection would not alter the total mix of information inasmuch as the SEC filings already disclosed such discounts.  Alternatively, the projection fails to warrant liability given the absence of a strong inference of scienter.

Shortly after this forecast, the following exchange took place:

> [Bloomberg News]:  *What keeps growth moving forward?*
>
> Sullivan:  *Well, we're very focused on continued conversion of the ThinPrep Pap Test in the market, from 57 percent to-we believe we could capture-100 percent of the market.*[23] There's no reason for a physician to use a conventionally prepared Pap smear, when you have a much more effective test that's in the ThinPrep PapTest . . . In addition, we have acquired a company that puts us into breast cancer screening called Product Health [sic], that we have just launched with our sales force at the beginning of this year.  And we expect somewhere between $9 and $15 million of revenue from that product, to kick in 2002.

(¶ 99, emphasis in complaint; Docket Entry # 32, Ex. I).  Two market analysts repeated Sullivan's statement that the company's current market share was 57%.  (¶ 102).

In February 2002, Cytyc announced a definitive merger agreement to acquire Digene Corporation ("Digene"), a publicly held manufacturer of a cervical cancer diagnostic screening system.  Subject to regulatory approval and a tender of over 50% of Digene stock, the deal proposed Cytyc purchasing Digene "for $76.9 million in cash, plus 23 million shares of Cytyc common stock."[24]  (¶ 103).  Shortly after the announcement, Cytyc shares

---

[23]  Defendants characterize this statement as inactionable puffery.  Although the statement that Cytyc could capture 100% of the market is corporate puffery, the statement that Cytyc had 57% of the market is not puffery.  The statement quantifies market share and two analysts repeated the statement.  (¶ 102); see In Re Scientific Atlanta, 239 F.Supp.2d 1351, 1361 n. 6 (N.D.Ga. 2002).  The 57% market share statement is nonetheless not actionable given the absence of a strong inference of scienter. See n. 65.

[24]  The 2001 Form 10-K released in March 2002 warns investors that, "Although [Cytyc] expects that its acquisition of Digene will close during the second quarter of 2002, [Cytyc] may

increased by $2.00.  (¶ 104).  Although Digene shareholders tendered more than 50% of outstanding Digene shares, the Federal Trade Commission ("FTC") eventually voted to block the acquisition on June 25, 2002.

On March 1, 2002, Cytyc filed the company's 2001 Form 10-K with the SEC.  The form repeats the statement in the 2000 Form 10-K that Cytyc has offered discounts in the past to stimulate demand "and *may elect* to do so in the future" and that such discounts "*could have* a material adverse effect on the Company's business, financial condition and results of operations."[25]  (¶ 110, emphasis in complaint; Docket Entry # 32, Ex. J).  The 2001 Form 10-K shows 2001 net sales of $220,993,000 or "an increase of 55.6%" over 2000 net sales of $142,065,000.  (¶ 115; Docket Entry # 32, Ex. J, p. F-4).

9.  <u>April 24, 2002 Conference Call</u>

In an April 24, 2002 press release, Cytyc again announced "record" earnings for the first quarter of 2002.  Cytyc reported net sales "of $68 million and net income of $17.6 million" or "increases of 43% and 58%, respectively, over the numbers for the

---

not be able to complete the acquisition during the second quarter, or at all."  (Docket Entry # 32, Ex. J).

[25]  Plaintiffs contend that a reasonable inference from this statement is that Cytyc only offered a one time discount.  They point to the April 24, 2002 conference call as supporting this inference.  On its face, however, the statement refers to "discounts," not "a discount."  Thus, the language of the statement, which refers to the plural "discounts" when describing the discounting in the past, coupled with the fact that the 2000 Form 10-K also notes that Cytyc has offered "discounts" in the past to stimulate demand makes the inference unreasonable.

first quarter 2001."  (¶ 117; Docket Entry # 32, Ex. K).   It also reported a market share of 64%.  (¶ 117).  The company scheduled a conference call after the close of trading.

The conference call began by cautioning listeners not to rely on forward looking statements.  (Docket Entry # 32, Ex. L). During the conference call, Bowen noted that the company's current estimate for the year 2002 is "between $0.55 and $0.60 per share" (Docket Entry # 32, Ex. L, p. 11), a downward departure from the $0.64 to $0.66 estimate forecast by Sullivan during the January 24, 2002 Bloomberg News interview.

The complaint states that during the conference call, Cytyc explained that "its larger customers were 'tightening inventory'"[26] and "that the inventory problem had manifested itself only in the first quarter of 2002."  (¶¶ 124 & 125).  The actual transcript reveals the following statements regarding inventory:

> Bowen: . . . Selected large lab ordering patterns shifted lower in the first quarter due to what we believe was an imbalance in physician demand versus existing lab inventory levels or a change in inventory management practice at the lab.
>
> Also during the quarter we implemented a promotional program directed at smaller labs, which was well received.  Although we believe that underlying demand at large and small labs continues to increase, in light of first quarter actions by selected large labs, consolidation in the lab industry and the response to our first quarter and promotional program at smaller labs, we anticipate a decline in near term shipment levels.

---

[26]   See footnote 28.

23

(Docket Entry # 32, Ex. L, p. 10).[27]

Thus, with regard to the inventory problem manifesting "itself *only* in the first quarter of 2002" (¶ 125, emphasis supplied), the actual transcript shows that both Bowen and Sullivan noted a change or shift in ordering patterns in the first quarter.  The complaint alleges that the statement was false or misleading because it fails to disclose the "systemic and continuous channel stuffing" as well as the shipment of unordered product and customer alienation.  (¶ 126).

When asked to "flush out" this sales promotion, Sullivan explained that Cytyc introduced the sales promotion as a response to "a change in ordering pattern at selected larger labs.  That change in ordering pattern we believe was either due to an imbalance at the lab in physician demand versus their existing inventory levels at that time or a change in the way in which they choose to manage their ThinPrep Pap Test inventory levels." (Docket Entry # 32, Ex. L, p. 13).  In essence, both Bowen and Sullivan disclosed that selected larger laboratories had an inventory "imbalance" and "ordering patterns shifted lower in the first quarter."[28]  (Docket Entry # 32, Ex. L, pp. 10 & 13).  As a

-----

[27]  Plaintiffs do not expressly object to considering the transcript of the conference in defendants' appendix and referred to in the complaint.  See Shaw v. Digital, 82 F.3d at 1220; Watterson v. Page, 987 F.2d at 3.

[28]  The complaint describes the "tightening inventory" statement, which originates from a Bloomberg News report, as misleading because Cytyc omitted that the inventory tightening stemmed from the channel stuffing.  (¶ 124; "Cytyc failed to state that its largest customers had been stuffed with so much extra inventory that there was no need for those customers to

result, the company offered a promotional program to smaller laboratories during the first quarter.

During the conference call, Sullivan explicitly advised the audience that, "This is not the first time-the first quarter that we've ever had promotional type programs."  (Docket Entry # 32, Ex. L, p. 16).  Bowen gave a more positive description explaining that, "We don't expect to have promotional programs in the small labs going forward, and what we expect to do is have our pricing patterns return to what we would consider to be the norm."[29] (Docket Entry # 32, Ex. L, p. 16).

After the conference call, a number of analysts made statements that plaintiffs seek to attribute to Cytyc.  One such third party statement derives from a UBS Warburg report wherein the analyst states that Cytyc stated during the conference call

---

order any more product for a long time to come").
    The Bloomberg News article, dated April 25, 2002, reads as follows:

> Big laboratories are tightening inventory, and Cytyc offered incentives to smaller labs, analysts said.  "The big concern is there's an inventory pushback on the part of large labs," said Banc of America Securities analyst Kurt Kruger, who rates Cytyc 'buy.'  "The company scrambled to provide some discounts to small labs to offset this."

(¶ 119, quotation marks taken from complaint).  Defendants argue, inter alia, that the report fails the entanglement test.

    [29]  Sullivan's remark not only shows that Cytyc disclosed, again, the discounts, but also militates against a finding of scienter.  Given Sullivan's description, Bowen's description shows at most negligence and the attempt to put a good face on the disclosure.  The forward looking remark, which in any event is not particularized in the complaint, also falls under the safe harbor provision of the PSLRA.  The market was not fooled inasmuch as Cytyc stock dropped precipitously the following day.

that it had "'instituted a one-time promotion for the smaller labs to drive conversion at these customers in the quarter.'"[30] (¶ 121).  During the conference call, however, Sullivan explicitly disclaimed that the promotion was a one time offer. (Docket Entry # 32, Ex. L, p. 16).

In addition to the Bloomberg News article and the UBS Warburg analyst's comments, an April 25, 2002 Pacific Growth Equities analyst report states that, "a 'change in the ordering and inventory practices of Cytyc's large lab customers necessitated a special promotion targeting smaller labs in order for Cytyc to meet Q1 expectations.'"[31]  (¶ 120).  As a result, the report explains, "'Cytyc lowered forward guidance.'"[32]  (¶ 120).

In response to the April 24, 2002 disclosure, Cytyc common stock fell from $24.80 per share on April 24 to $15.73 per share

---

[30]  Plaintiffs seek to hold Cytyc responsible for this third party statement of the promotion as a "'one-time'" event.  They submit the description is misleading inasmuch as Cytyc engaged in a continuous pattern of channel stuffing throughout the class period.

[31]  There is nothing false or misleading about the statement that Cytyc offered a "special promotion."  Cytyc did offer a special promotion.  There was no duty to also add, "as we've done a number of times in the past."  As argued by defendants (Docket Entry # 31, pp. 22-25 & n. 14), the complaint fails to sufficiently pled why the statement was false or misleading.  The third party statement attributing the statement to "Cytyc" also fails the entanglement test described infra.

[32]  In particular, the report states that, "Cytyc's recent experience with shifting laboratory inventory practices led to lowered guidance for Q2 and the remainder of 2002."  (Docket Entry # 32, Ex. N).

at the close of trading on April 25.  (¶ 129).  In May and June, members of Cytyc's sales force discussed whether the stock "would plummet further."  (¶ 132).

During the April 24, 2002 conference call, Sullivan intimated that Cytyc was going to try to cue its business more closely to physician demand.  According to Sullivan, Cytyc would try to have a leaner "supply chain" and a better understanding of inventory at the laboratories.  (Docket Entry # 32, Ex. L, p. 24).  In May and June 2002, Cytyc executives informed the salesforce "that 'they were changing the market strategy to have more stable shipments so that we wouldn't be flooded at the end of the quarters,'" according to the former Cytyc manufacturing manager.  (¶ 131; see also ¶ 156).  The company, however, continued to pressure the sales force to meet the quotas, according to the former Cytyc CA account executive.[33]  (¶ 131).

At least one market analyst viewed the Cytyc issue as short term.  According to his or her June 21, 2002 report, "'We believe that some of the short term issues, mainly inventory in the

---

[33]  The former Cytyc manufacturing manager related that in May and June 2002:

> I heard that the stock is probably going to take a downswing, because of the fact that the channels are flooded.  I asked, well how did the channels get that flooded?  That became the first time that someone in distribution explained to me that the sales people were under pressure to make deep discounts [in order to convince customers] to buy bigger quantity at the end of quarters in order to meet the goals to keep the revenues up so that the stock price could be maintained.

(¶ 132).

channels . . . will be resolved over the next six weeks.'"  (¶ 134).  On June 24, 2002, however, Cytyc issued a press release further lowering the company's expected revenues for 2002 to a "'range of $230 million to $245 million, with pro forma earnings of $0.40 to $0.44 per share.'"  (¶ 137).

During the conference call the following day, "Cytyc representatives explained that the downward revision was necessitated because of the method of gauging demand for ThinPrep that Cytyc had been using, which had been based on shipments to laboratories, overestimated end-user demand." (¶ 138).  Cytyc also announced a change in revenue recognition "to a system that was more reflective of end-user demand."  (¶ 138).

The market negatively reacted to the news and the price of Cytyc shares feel from $11.46 per share on June 24 to $6.88 per share at the close of trading on June 25, 2002.  In contrast to the 64% market share Cytyc reported for the first quarter of 2002 in the April 24, 2002 press release, a Thomas Weisel Partners LLP analyst posited that, "'we believe the ThinPrep Test had a 50.0% market share at the end of 1Q02.'"  (¶¶ 117 & 140).  Another market analyst likewise depicted "'an inventory overhang of $32-35 million that needs to work its way through the lab channel for Cytyc to put this issue behind it."  (¶ 141).

As a further means to infer scienter, the complaint notes that Sullivan and Bowen controlled the content of Cytyc press releases and SEC filings and could therefore falsify information about Cytyc's performance and products.  (¶ 147).  Intimately

28

involved in the company, both Sullivan and Bowen were kept informed "on an ongoing basis" about the company's problems. (¶¶ 148-149).[34]  Both Sullivan and Bowen, described as "very hands-on managers," attended sales meetings where Cytyc management stressed the importance of meeting sales expectations, according to the former Cytyc CA account executive and the unnamed human resources representative.  (¶¶ 153 & 154).

Sullivan also purchased Cytyc stock during the class period. More specifically, on December 6, 2001, Sullivan sold 55,000 shares of Cytyc common stock at a price of $24.90 per share.  He sold an additional 20,000 shares the following day, also for $24.90 per share.  Gross proceeds totaled $1,867,500 or approximately four times Sullivan's annual salary.

The amount, however, represents approximately 10% of Sullivan's Cytyc holdings.  The $24.90 share price was not the high during the class period, which briefly hovered around $30.00 per share in October 2001.  (Docket Entry # 32, Ex. R).[35]  Even more significant, Sullivan's sales during the class period are less than his sales both prior to and after the class period.

---

[34]  The complaint does not attribute the statement to anyone or provide a time frame.

[35]  Although the data is attached to defendants' opposition, it is appropriate to take judicial notice of the sales price during the class period on a motion to dismiss.  In Re NAHC, Inc. Securities Litigation, 306 F.3d 1314, 1331 (3rd Cir. 2002) (affirming lower court's decision to take judicial notice of stock price data on motion to dismiss).  Plaintiffs did not object to the submission.  In any event, the complaint reflects a class period high of $27.52 (¶ 10), a price still in excess of the price Sullivan sold his shares.

For example, Sullivan sold 130,800 shares or approximately 15% of his holdings in April 2001 and 189,930 shares or approximately 22% of his holdings in December 2002.  (Docket Entry # 32, Ex. Q).[36]

C.   Cytyc's Revenue Recognition Policy

As a result of the end of quarter discounts, Cytyc pushed sales into earlier quarters than normally would have occurred. Customers also accumulated inventory in amounts that they did not immediately use.  Improper recognition of revenue materially inflated the company's reported results making the financial statements misleading or false, according to the complaint.

Plaintiffs allege that the channel stuffing as well as the shipments of additional and unordered product violated the company's revenue recognition policy, GAAP and SEC regulations[37]

---

[36]   Where, as here, plaintiffs raise an allegation of insider trading (see Docket Entry # 36, p. 43) and do not challenge the authenticity of the public documents, this court may consider the entirety of the Form 4 filings without converting the motion to dismiss into a motion for summary judgment.  See In Re Stone & Webster, 253 F.Supp.2d at 128 & n. 11 (considering copies of SEC Forms 4 without converting motion to dismiss into motion for summary judgment); In Re Millstone Scientific Securities Litigation, 103 F.Supp.2d at 450-451 & n. 15 (considering numerous SEC public filing documents without converting motion to dismiss into motion for summary judgment and noting that court may consider "matters of public record" and "documents referred to in the complaint"); see also Blackstone Realty, LLC v. FDIC, 244 F.3d at 195 n. 1 (exhibits attached to complaint properly considered for purposes of Rule 12(b)(6), Fed. R. Civ. P.); Watterson v. Page, 987 F.2d at 3.

[37]   The complaint (¶ 55) correctly notes that under an SEC regulation, 17 C.F.R. § 210.4-01(a)(1), "filings that do not comply with GAAP "'will be presumed to be misleading and inaccurate.'"  In Re Cabletron Systems, Inc., 311 F.3d 11, 34

thereby evidencing a strong inference of scienter.  Plaintiffs maintain that Cytyc's channel stuffing violates certain provisions of the Financial Accounting Standards Board ("FASB"), SEC Staff Accounting Bulletin 101 ("SAB 101"), FASB Statement of Financial Accounting Standards ("SFAS") and an opinion of the Accounting Principles Board ("APB").[38]  The complaint alleges that during the class period, the financial statements of Cytyc violated the following principles of fair financial reporting:

(1) the principle that financial reporting should provide accurate, reliable and useful information concerning an entity's performance and that investors commonly use the company's performance in the past as a reliable indicator of the company's performance in the future (¶¶ 54 & 61, citing FASB Concepts Statement No. 1; ¶¶ 34, 42 & 58-59);[39]

(2) the principle that revenues should not be recognized until "realized or realizable and earned" (¶ 56, citing FASB Concepts Statement No. 5, ¶ 83; SAB 101; FASB Concepts Statement

─────────────

(1st Cir. 2002) (citing to 17 C.F.R. § 210.4-01(a)(1)).

[38]  GAAP "'are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").'"  In Re Enron Corporation Securities, 235 F.Supp.2d 549, 572 n. 11 (S.D.Tx. 2002).  The complaint cites inter alia to FASB Concepts Statements 2, 5, 33, 34, 41, 42, 58, 59 and 83.

[39]  In relation to this category, the complaint further notes that by pulling in revenues from future quarters into earlier quarters, defendants violated FASB Concepts Statement Number One because reported revenues in the earlier quarters were not reliable representations of revenues.  (¶ 62).

No. 2; SFAS No. 48;[40] Accounting Research Board No. 43; APB

opinion 10; ¶¶ 57, 59 & 80, all citing SAB 101);[41] and

(3) the principle requiring companies to "describe known

trends or uncertainties" that have a material effect on sales and

revenues in all Form 10-K and 10-Q reports, particularly those

events known to management that would cause reported financial

information not to be reflective of future operating results (¶¶

63-66, citing 17 C.F.R. § 229.303).[42]

---

[40] SFAS 48 circumscribes declaring revenue when a right of
return exists.  See generally Aldridge v. A.T. Cross Corporation,
284 F.3d at 79.  There are no particular allegations that
ThinPrep shipments were returned or that such shipments amounted
to contingent sales.  Moreover, under SFAS 48 allowing a right of
return in a particular transaction "does not per se mean that
revenue cannot be recognized at the time of sale."  In Re Focus
Enhancements, Inc. Securities Litigation, 309 F.Supp.2d 134, 151
(D.Mass. 2001).
    Alternatively, the complaint's brief reference to the
regulation, without more, is conclusory and lacks the necessary
pleading detail required under the PSLRA.  See Fitzer v. Security
Dynamics Technologies, Inc., 119 F.Supp.2d 12, 35 (D.Mass. 2000).

[41] Although revenue does not have to be received before
recognized, there should be "persuasive evidence of an
arrangement."  (¶ 56).  In other words, there should be evidence
of delivery and a fixed price such that "collectability of the
sales price is reasonably assured."  (¶ 56).  There must be
sufficient evidence of an arrangement.  (¶ 80, quoting SAB 101).

[42] The pertinent SEC regulation imposes a duty on
registrants to:

> Describe any known trends or uncertainties that have had or
> that the registrant reasonably expects will have a material
> favorable or unfavorable impact on net sales or revenues or
> income from continuing operations.  If the registrant knows
> of events that will cause a material change in the
> relationship between costs and revenues (such as known
> future increases in costs of labor or materials or price
> increases or inventory adjustments), the change in the
> relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii).

The company's financial statements during the class period and the 2001 Form 10-K contain the company's stated policy for revenue recognition.  The policy corresponds to SAB 101 and reads as follows:

> The Company recognizes product revenue upon shipment, provided that there is persuasive evidence of an arrangement, there are no uncertainties regarding acceptance, the sales price is fixed or determinable, collection of the resulting receivable is probable and only perfunctory Company obligations included in the arrangement remain to be completed.

(¶¶ 58 & 78; accord Docket Entry # 32, Ex. J, p. F-7).  The 2001 Form 10-K elsewhere describes Cytyc's policy in a similar manner:

> The Company follows very specific and detailed guidelines in measuring revenue; *however, certain judgments affect the application of its revenue policy.  For example, revenue is not recognized from sales transactions unless the collection of the resulting receivable is reasonably assured.  The Company assess[sic] collection based on a number of factors, including past transaction history with the customer and the credit-worthiness of the customer.*  If it is determined that the collection fee is not reasonably assured, the fee is deferred and revenue is recognized at the time collection becomes reasonably assured, which is generally upon receipt of cash.

(¶ 112, emphasis in complaint; Docket Entry # 32, Ex. J, p. 20).

Cytyc's channel stuffing purportedly improperly pulled revenue from future quarters into previous quarters.  (¶ 62, citing FASB Concepts Statement No. 1; ¶¶ 33, 41 & 58-59).  Because of Cytyc's practice of channel stuffing, the Forms 10-K and 10-Q covering the class period failed to disclose that current revenues were achieved at the expense of future revenues.  (¶ 66).  The forms thereby mischaracterized current financial growth and failed to disclose known trends in violation of 17 C.F.R. § 229.303, according to the complaint.  (¶ 66).

DISCUSSION

A.  Essential Elements of Securities Fraud Liability

Liability under Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, requires the plaintiff to plead with particularity that, in connection with the sale or purchase of a security, the defendant:  (1) "made a false statement or omitted a material fact;" (2) "with the requisite scienter;" and that (3) the "plaintiff relied on the statement or omission;" (4) "with resultant injury."  In Re Boston Technology, Inc. Securities Litigation, 8 F.Supp.2d 43, 52 (D.Mass. 1998); accord Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996) (the "plaintiff must plead, with sufficient particularity, that the defendant made a false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement or omission caused the plaintiff's injury").  The circumstances in the case at bar primarily concern the first and second elements.

Under the first element, the plaintiff must allege that a defendant either:  "'(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading.'"  Baron v. Smith, 380 F.3d 49, 52 (1st Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(1)).  The falsity or untruth of the various statements presents a relatively straight forward analysis.  The misleading nature of the statements poses a more exacting inquiry.

In order to create liability for an omission, as opposed to an affirmatively stated falsehood, there must be a duty to disclose the omitted nonpublic information.  <u>Gross v. Summa Four, Inc.</u>, 93 F.3d at 992 ("corporation must first have a duty to disclose the nonpublic material information"); <u>Shaw v. Digital Equipment Corporation</u>, 82 F.3d at 1202 ("silence, absent a duty to disclose, cannot be actionably misleading").  Simply reporting past historical earnings or successes does not give rise to a duty to report present circumstances which are less rosy.  <u>Suna v. Bailey Corporation</u>, 107 F.3d 64, 68 (1st Cir. 1997).  For example, if a corporation accurately reports that, "'This is our eighth consecutive quarter in which our gross has increased,'" there is not duty to add, "'We are concerned about the next one.'"  <u>Serabian v. Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357, 361 n. 4 (1st Cir. 1994) (further noting the rule may be different if the defendant apprehends "'a disaster'").

Where, however, "a corporation does make a disclosure--whether it be voluntary or required--there is a duty to make it complete and accurate."  <u>Gross v. Summa Four, Inc.</u>, 93 F.3d at 992; <u>Backman v. Polaroid Corporation</u>, 910 F.2d 10, 16 (1st Cir. 1990) ("voluntary disclosure that a reasonable investor would consider material must be complete and accurate"); <u>In Re Boston Technology, Inc. Securities Litigation</u>, 8 F.Supp.2d at 54 ("when an issuer opts to make a statement, that statement must be 'complete and accurate'"); <u>see</u> <u>also</u> <u>Lucia v. Prospect Street High Income Portfolio, Inc.</u>, 36 F.3d 170, 175 (1st Cir. 1994)

(recognizing that statement can be literally accurate but nonetheless misleading).  A duty thus arises where, for instance, "a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information."  Gross v. Summa Four, Inc., 93 F.3d at 992; see Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d 235, 242 (D.Mass. 2001) ("'duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement'"); see also Shaw v. Digital Equipment Corporation, 82 F.3d at 1202-1203 ("task depends, in essence, on conceptions of materiality").

It is equally well settled that the false or omitted fact must be "material."  An omitted or misrepresented fact is "considered material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'"  Gross v. Summa Four, Inc., 93 F.3d at 992; accord In Re Cabletron, 311 F.3d at 33 ("fact is material if it is substantially likely that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available").  "Information which would have assumed actual significance in the deliberations of a reasonable shareholder is material."  Baron v. Smith, 380 F.3d at 52.  Issues of materiality are normally left for the "jury rather than resolved by the court on a motion to dismiss."  In Re

36

Cabletron, 311 F.3d at 34.

In addition to a materially false statement or the omission of a material fact, the plaintiff must show that the defendant acted with scienter.  Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'"  Greebel v. FTP Software, 194 F.3d at 194 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976)).  It can be proven with knowing or reckless conduct.  Geffon v. Micrion Corporation, 249 F.3d 29, 35 (1st Cir. 2001).  Under the former, the plaintiff must show that the defendant "knew (i) that the statement was false or misleading, and (ii) that it was made in reference to a matter of material interest to investors."  Geffon v. Micrion Corporation, 249 F.3d at 35.  Under the latter, there must be a showing of "more than mere negligence."  Geffon v. Micrion Corporation, 249 F.3d at 35.  Recklessness, which is more akin to a lesser form of intent than ordinary negligence, Greebel v. FTP Software, Inc., 194 F.3d at 199, consists of "'a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'"  Geffon v. Micrion Corporation, 249 F.3d at 35; Orton v. Parametric Technology Corporation, 344 F.Supp.2d 290, 299 (D.Mass. 2004) (same).

B.  Pleading Requirements

Greebel is the seminal case in this circuit with respect to

37

pleading a securities action under Rule 9(b), Fed. R. Civ. P. ("Rule 9(b)"), and the PSLRA.  <u>Greebel v. FTP Software</u>, 194 F.3d at 193-194; <u>In Re Allaire Corporation Securities Litigation</u>, 224 F.Supp.2d 319, 325 (D.Mass. 2002).  As explained in <u>Greebel</u>, the pleading standards under the PSLRA are congruent to the First Circuit's strict and rigorous application of Rule 9(b) prior to the 1995 enactment of the PSLRA.  <u>Greebel v. FTP Software</u>, 194 F.3d at 192.

The pleading requirements under the PSLRA, as well as First Circuit caselaw interpreting Rule 9(b), first require the plaintiff to specify in the complaint "each allegedly false or misleading statement 'including its time, place and content.'" <u>In Re Allaire Corporation Securities Litigation</u>, 224 F.Supp.2d at 324 (quoting <u>Greebel v. FTP Software</u>, 194 F.3d at 193-194). Second, the complaint must "'specify the reason or reasons why the statement is misleading.'"  <u>Greebel v. FTP Software</u>, 194 F.3d at 193 (quoting statute with internal brackets omitted).  In other words, the complaint must explain and provide factual support as to "why the challenged statement or omission is misleading."  <u>Greebel v. FTP Software</u>, 194 F.3d at 193; <u>see</u> <u>In Re Allaire Corporation Securities Litigation</u>, 224 F.Supp.2d at 324 ("[e]very claim that a statement or omission was fraudulent must be supported by facts showing exactly why it was misleading"). Third, if a claim rests on information and belief, the plaintiff must "'set forth the source of the information and the reasons for the belief.'"  <u>Greebel v. FTP Software</u>, 194 F.3d at 194; <u>In</u>

Re Allaire Corporation Securities Litigation, 224 F.Supp.2d at 324; see also In Re Cabletron, 311 F.3d at 28 (discussing inconsistency in definitions of what constitutes a statement made upon "information and belief").

Fourth, the complaint must state "with particularity facts that give rise to a 'strong inference' of scienter rather than merely a reasonable inference." In Re Cabletron, 311 F.3d at 28 (quoting statute). Although pleading scienter may and often is established through inference, the inference must be strong. In Re Cabletron, 311 F.3d at 28 (further explaining how this framework alters "the usual contours" of Rule 12(b)(6) analysis); Greebel v. FTP Software, 194 F.3d at 195 (same).[43]

Before exploring the absence of a strong inference of scienter with respect to any remaining statements, this court examines and rejects the revenue recognition allegations and the misleading nature of the discounting statement set forth in the financial statements as well as the allegations based upon unordered or additional product. Proceeding along a statement by statement analysis, see Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d at 243; In Re Boston Technologies Securities Litigation, 8 F.Supp.2d at 55, this court then culls the actionable statements in the complaint as distinguished from the nonactionable statements of corporate puffery and those that fall within the safe harbor provision of the PSLRA for forward looking

---

[43]    As also explained in Greebel, the PSLRA does not alter the pre-existing substantive definition of scienter employed in the First Circuit.  Greebel v. FTP Software, 194 F.3d at 200.

statements.

C.   <u>Revenue Recognition</u>

In support of pleading a strong inference of scienter as well as setting forth this material element, plaintiffs point to defendants' purported violations of SEC rules, GAAP and Cytyc's own revenue recognition policy.[44]   (Docket Entry # 36, pp. 37-40).   Separate and apart from the fact of this case, plaintiff's legal position is accurate.   <u>See</u> <u>Aldridge v. A.T. Cross Corporation</u>, 284 F.3d at 83 (paraphrasing <u>Geffon v. Micrion Corporation</u>, 249 F.3d at 35, that "'accounting shenanigans' may be evidence of scienter"); <u>In Re Cabletron</u>, 311 F.3d at 39 ("[s]ignificant GAAP violations also 'could provide evidence of scienter'"); <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d at 203 ("[v]iolations of GAAP standards . . . could provide evidence of scienter"); <u>In Re Galileo Corporation Shareholders Litigation</u>, 127 F.Supp.2d 251, 266 (D.Mass. 2001) ("'a violation of a company's own policies supports an inference of scienter'").

Plaintiffs identify statements in the Forms 10-K regarding discounts as materially misleading (¶¶ 110-111 & 116) as well as the company's stated policy of recognizing revenue as materially misleading because the company engaged in channel stuffing.  (¶¶ 112-114 & 116); <u>see</u>, <u>e.g.</u>, <u>In Re Cabletron</u>, 311 F.3d at 34 (noting the allegation of financial report filings as materially

---

[44]   Plaintiffs additionally contend that the violations of GAAP, SEC regulations and Cytyc's policy show the falsity or misleading nature of the statements made during the class period because revenue should not be recognized until realized or realizable.  (<u>See</u>, <u>e.g.</u>, ¶¶ 60-62).

misleading).  Plaintiffs further complain that the company's financial statements were materially false and misleading because they inflated or overstated revenues, accelerated revenues into earlier quarters and failed to disclose known trends such as channel stuffing.  (See, e.g.,[45] ¶¶ 52, 53, 56 & 66).  Unfortunately for plaintiffs, none of these allegations survive defendants' motion.

Turning to the first two aforementioned global categories of revenue recognition violations, it is true that systemically recognizing revenues before earned and accounting for such premature revenues contravene GAAP principles set forth in FASB Concepts Statement Number One.  See In Re Daou Systems, Inc. Securities Litigation, 2005 WL 237645 at * 8 (9th Cir. Feb. 2, 2005) ("premature recognition . . . could violate other GAAP principles such as" FASB Concepts Statement No. 1); (¶¶ 34 & 58-59; ¶ 61, citing these principles).  It is also true that the cited regulations in the second category generally require that a company not recognize revenue in financial statements until "realized or realizable and earned."[46]  (¶ 56; see also ¶¶ 57 & 79-80).  For example, SAB 101, repeatedly referenced in the complaint (¶¶ 56, 57, 59 & 80), "requires that "'revenue should not be recognized until it is realized or realizable and

_____

[45]  To state the obvious, the cited list of paragraphs is not exhaustive.

[46]  Plaintiffs' citation to a litany of SEC regulations and accounting principles is conclusory and fails to explicitly tie the violation to a particular duty and accounting regulation.

earned.'"   In Re BellSouth Securities Litigation, 2005 WL 327178

at * 16 (N.D.Ga. Feb. 8, 2005) (quoting SAB 101) Barrie v.

Intervoice-Brite, Inc., 2005 WL 57928 at * 3 (5th Cir. Jan. 12,

2005) (further noting that SEC adopted SAB 101 "to guide

companies in applying SEC Rules and GAAP to revenue recognition

issues").   SEC regulations additionally state that filings that

do not conform with GAAP are presumed to be misleading or

inaccurate.   (¶ 55); 17 C.F.R. § 210.4-01(a)(1); In Re Segue

Software, Inc. Securities Litigation, 106 F.Supp.2d 161, 164 n. 4

(D.Mass. 2000).

The class period Forms 10-Q and 10-K, however, do not

evidence improper revenue recognition under these regulations.

The channel stuffing allegations (see, e.g., ¶¶ 68(f)) are not

within the reach of the aforementioned regulations inasmuch as

there is no evidence that ThinPrep shipments were returned or

that Cytyc engaged in contingent sales, a pattern of undisclosed

price protection and take back guarantees or reported revenue

from fictitious sales.   Cf. Aldridge v. A.T. Cross Corporation,

284 F.3d at 79 (involving price protection policy and contingent

sales as opposed to only channel stuffing).[47]   As aptly explained

---

[47]   The Aldridge case is distinguishable for the reasons set
forth by defendants in their reply brief.  (Docket Entry # 39, p.
16).   Although defendants exaggerate the absence of specific
statements, there remains the absence of contingent or fictitious
sales, returned product or a pattern of price protection and take
back guarantees in the case at bar.   The facts fail to indicate
that the discounts resulted in revenue not being realized, as
reported.   See Gross v. Summa Four, Inc., 93 F.3d at 994.   Thus,
there is an absence of factual support for the necessary element
of falsity or material omissions with respect to the innocuous
channel stuffing alleged in this action as applied to the alleged

by a court in this district:

> [P]ull-ins or deep discounts are not the nefariously manipulative scheme that plaintiffs make them out to be. Pull-ins do not result in the improper recognition of revenue under generally accepted accounting principles ("GAAP"). They are actual sales which are treated no differently than any other sale.

In Re Peritus Software Services, Inc., 52 F.Supp.2d 211, 223 n. 3 (D.Mass. 1999) (internal quotation marks, brackets and citations omitted). The facts fail to indicate that the discounts resulted in revenue not being realized, as reported and in accordance with the Cytyc's stated accounting or revenue recognition policy. See Gross v. Summa Four, Inc., 93 F.3d at 994. Stated otherwise, the excessive discounting did not prevent transactions from being completed. The financial statements accurately reflect earnings made upon and after persuasive evidence of an arrangement.

In any event, contrary to plaintiffs' position, the discounting was adequately disclosed. The Forms 10-K and 10-Q recognize the use of discounts and that such discounts could have a material adverse effect on Cytyc's financial condition. (Docket Entry # 32, Ex. B & J, "In the past, the Company has offered discounts to stimulate demand for the ThinPrep System and may elect to do so in the future, which discounts could have a

---

GAAP, SEC and company policy violations.

Thus, while the number of former unnamed employees is sufficient and they occupy positions that give them a strong basis for possessing the information about the company's channel stuffing, see In Re Cabletron Systems, 311 F.3d at 30; Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 22, the stories themselves lack the necessary facts to support the allegation that Cytyc violated the aforementioned GAAP, SEC and its own revenue recognition rules.

material adverse effect on the Company's business, financial condition and results of operations;" Docket Entry # 32, Ex. D, incorporating risks detailed in the 2000 Form 10-K and that such risks "may have a material adverse effect upon on the Company's business, financial condition and results of operations").

Accordingly, Cytyc's stated accounting or revenue recognition policy as well as the statement regarding discounts (¶¶ 110-116) in the financial statements neither contravenes the aforementioned regulations in the first and second categories nor amounts to a false or misleading statement.[48]  Also in this respect, there is no inference of scienter due to the absence of a violation of the foregoing GAAP and SEC provisions and Cytyc's revenue recognition policy or otherwise.[49]

The final category of allegedly improper revenue recognition which arises under Item 303 of 17 C.F.R. § 229.303 is likewise unavailing.[50]  First, although the complaint expressly complains about the failure of the Forms 10-K and 10-Q to disclose the use

---

[48]  Additional reasons explaining why the discount statement is not misleading or false are discussed infra.

[49]  Even if such activity gave rise to a weak inference of scienter, without more, the complaint fails to pled the strong inference of scienter now required under the PSLRA.

[50]  The regulation,  17 C.F.R. § 229.303(a) and (b), commonly referred to as "Item 303," governs Form 10-K and 10-Q filings.  Item 303 "requires corporate management to disclose, inter alia, 'any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations . . ..'"  Kafenbaum and Schulman v. GTECH Holdings Corporation, 217 F.Supp.2d 238, 249 (D.Mass. 2002).

of discounts as a known trend "'that would cause reported financial information not to be necessarily indicative of future operating results'" (¶¶ 64 & 66, quoting instructions to Item 303), the rule in "Item 303, 17 C.F.R. § 229.303(a)(3)(ii), . . . has to be read in light of the SEC's instruction to this paragraph which expressly states that forward-looking information need not be disclosed.  17 C.F.R. § 229.303(a), Instruction 7." Glassman v. Computervision Corporation, 90 F.3d 617, 631 (1st Cir. 1996); accord Romine v. Acxiom Corporation, 296 F.3d 701, 708 n. 3 (8th Cir. 2002) ("While § 229.303(a)(3)(ii) provides that 'known trends or uncertainties' be disclosed in certain SEC filings, another SEC regulation, which expressly addresses forecasts, states that forward-looking information need not be disclosed.  17 C.F.R. § 229.303(a)").

        Second, it is not objectively unreasonable to omit the fact that the discounts, or channel stuffing, "would" as opposed to "could" have a material adverse effect on the company's future earnings.  See, e.g., Oxford Asset Management, Limited v. Jaharis, 297 F.3d 1182, 1191 (11th Cir. 2002) ("failure to allege facts from which the objective unreasonableness of Kos management's decision not to include the prescription information . . . could be inferred forecloses reliance upon Item 303 as a source of a duty to disclose that information"), cert. denied, 540 U.S. 872 (2003).  In addition, the import of the language was obvious making the distinction between "could" and "would" immaterial.  See Baron v. Smith, 285 F.Supp. 96, 104 (D.Mass.

45

2003) ("where company disclosed that largest customer began 'trial' of service product, it was not necessary also to disclose that customer had not committed to purchasing service, since uncertainty of commitment to purchase was obvious from word 'trial'") (paraphrasing In Re Boston Technologies Securities Litigation, 8 F.Supp.2d at 61), aff'd, 380 F.3d 49 (1st Cir. 2004).  Finally, although the information regarding discounts appears in the Forms 10-K under "marketing and sales" as opposed to under "results of operations," the placement, without more, is not actionable.[51]

Third, the Forms 10-K directly and the Form 10-Q by incorporation adequately disclosed the use of discounts.  See, e.g., Shaw v. Digital Equipment Corporation, 82 F.3d at 1206 (disclosure of marketing strategy in reducing prices adequately disclosed in SEC filings thereby obviating alleged violation of 17 C.F.R. § 229.303); Baron v. Smith, 380 F.3d at 54-56.

D.  Unordered and Additional Product

Recognizing as revenue unordered product or shipping additional product without an order, as distinguished from channel stuffing through the use of deep discounts, is more egregious and poses a more forceful argument that Cytyc engaged in conduct in violation of its own or SEC and GAAP revenue recognition requirements.  With respect to unordered or additional product, however, the complaint falls well short of

---

[51]    The Form 10-Q refers to the risk factors in the annual Form 10-K report without expressly listing the use of discounts.

46

providing sufficient detail to satisfy Rule 9(b) and the PSLRA. See In Re Galileo Corporation, 127 F.Supp.2d at 268 (generally alleging that revenues in second quarter were false and failing to provide details about amount of warranty reserve understatement made pleading deficient under Rule 9(b) and PSLRA); Fitzer v. Security Dynamics Technologies, 119 F.Supp.2d at 35-36 (channel stuffing allegations deficient under Rule 9(b) and PSLRA); Lirette v. Shiva Corporation, 27 F.Supp. 268, 278 (D.Mass. 1998).

In contrast to the repeated and numerous allegations of channel stuffing on the part of former Cytyc employees,[52] the complaint provides few particulars about the when, where, amount and nature of the transactions of unordered product and the relationship between the amount of unordered product shipped and the company's total revenues.  The two instances of shipment of additional product related by the former Cytyc senior representative (¶ 44) and the former Cytyc sales representative (¶ 38) are too general and lack repeated corroboration to satisfy PSLRA pleading.  Cf. In Re Cabletron, 311 F.3d at 30-31.  Thus, the instances of unordered product or shipment of additional product above what had been ordered (see ¶¶ 5, 7, 44, 49, 61 & 82(c)), as distinguished from the deep discounting at the end of every quarter and/or "channel stuffing," lack detail and corroboration by other employees.  Eschewing a categorical approach, see In Re Cabletron, 311 F.3d at 32 (rejecting

---

[52]   See footnote number 47, ¶ 2.

"categorical approach" and noting that "'Congress was concerned with the quantum, not type, of proof'"), the complaint lacks the "quantum" of proof and particularity to satisfy the PSLRA with respect to the shipments of unordered or additional product. Accordingly, such allegations cannot support a finding that Cytyc's stated revenue recognition policy or the use of discounts or other channel stuffing activity was false or misleading or that defendants acted with scienter.

E.   Specific Statements

Defendants attack a number of the statements in the complaint as nonactionable corporate puffery or falling within the PSLRA's safe harbor provision for forward looking statements.

As to the former, "Vague and loosely optimistic statements" are "nonactionable as a matter of law." Gross v. Summa Four, Inc., 93 F.3d at 987 (affirming dismissal of complaint). This rule applies to statements concerning both current affairs and future prospects. Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 300 ("corporate puffery rule 'covers loose optimism about both an issuer's current state of affairs and its future prospects'"); In Re Boston Technology, Inc. Securities Litigation, 8 F.Supp. at 54 (same). "Rosy affirmation[s] commonly heard from corporate managers," such as we "expect another year of strong growth" or "the company is on target toward achieving the most profitable year in its history," are "numbingly familiar." Shaw v. Digital Equipment Corporation, 82 F.3d at 1217-1218 (internal quotation marks and citations

48

omitted).  Consequently, "no reasonable investor could find" such "optimistic" or "vague" statements "important to the total mix of information."  Shaw v. Digital Equipment Corporation, 82 F.3d at 1217.  In the parlance of common law fraud, such statements amount to "'puffing' or 'sales talk.'"  Shaw v. Digital Equipment Corporation, 82 F.3d at 1217 n. 32.

The more specific, definite or concrete the outward statement is, however, the greater the likelihood the statement is material and not mere puffery.  See Gross v. Summa Four, Inc., 93 F.3d at 995 (distinguishing the actionable statements in Alfus v. Pyramid Technology Corporation, 764 F.Supp. 598 (N.D.Cal. 1991), from inactionable statements in that case because "statements in Alfus dealt with definite projections," such as a forecast of 40% revenue growth).  For example, the inclusion of "a market share figure" might push a nonactionable statement beyond the realm of "mere optimistic corporate puffery."  Fitzer v. Security Dynamics Technologies, 119 F.Supp.2d at 26 (finding phrase "'continued market demand'" vague and optimistic in part because phrase did not specify "market share figure").  Similarly, more cautious or subdued statements are less likely to be actionable than more strongly optimistic or concrete statements that contrast sharply with internal reality.  See Glassman v. Computervision Corporation, 90 F.3d at 635-636 (duty to disclose problems with new product "may arise where a company makes strongly optimistic or concrete statements . . . in stark contrast to its internal reports" as opposed to "subdued

49

generally optimistic statements" that amount to "puffery," citing San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 811 (2nd Cir. 1996)). "[M]ild statements of hope, couched in strongly cautionary language," are not materially misleading. Glassman v. Computervision Corporation, 90 F.3d at 636.

Defendants also rely on the PSLRA's safe harbor provision with respect to a number of the forward looking statements in the complaint. Generally speaking, forecasts or other forward looking statements are not exempt from liability. Suna v. Bailey Corporation, 107 F.3d at 70. They are, however, only actionable "if the forecast might affect a reasonable investor in contemplating the value of a corporation's stock." Suna v. Bailey Corporation, 107 F.3d at 70 (internal quotations marks and citation omitted). In addition, there must be a showing that the forecast was false or misleading, in other words, that facts known by the forecaster at the time of the forecast (as distinguished from simply fraud by hindsight) made the anticipated forecast or success unlikely. See Suna v. Bailey Corporation, 107 F.3d at 70 (had the plaintiff "presented facts known by Bailey, and contemporaneous with the statements above, that would show that Bailey's anticipated success was unlikely, such facts would have adequately alleged a claim of securities fraud").

The PSLRA provides a safe harbor provision for forward looking statements that include cautionary warning[s]. Analogous

to the "bespeaks caution" doctrine, see H.R. Conf. Rep. No. 104-369, * 44 (1995) ("[t]he Conference Committee safe harbor, like the Senate safe harbor, is based on aspects of SEC Rule 175 and the judicial created 'bespeaks caution' doctrine"), the relevant provision in 15 U.S.C. § 78u-5(c)(1)(A)(i) "shelters forward-looking statements that are accompanied by meaningful cautionary statements." Greebel v. FTP Software, Inc., 194 F.3d at 201; 15 U.S.C. § 78u-5(c)(1)(A)(i). The statutory language precludes liability for a forward looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or is "immaterial."[53] 15 U.S.C. § 78u-5(c)(1)(A)(i) & (ii). The Conference Committee's discussion clarifies that "'[i]mportant' factors means [that] the stated factors identified in the cautionary statement must be relevant to the projection."[54] H.R. Conf. Rep. No. 104-369, * 44

---

[53]    The inclusion of the latter language simply clarifies that, "Courts may continue to find a forward-looking statement immaterial-and thus not actionable under the 1933 Act and the 1934 Act-on other grounds" irrespective of the statutory safe harbor provision." H.R. Conf. Rep. No. 104-369, * 43 (1995).

[54]    The following parts of the committee's discussion are illuminating:

> The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business. As part of the analysis of what constitutes a meaningful cautionary statement, courts should consider the factors identified in the statements. "Important" factors means the stated factors identified in

(1995) (further noting that "boilerplate warnings will not

suffice").  On the other hand, the cautionary statement does not

necessarily have "to include the particular factor that

ultimately causes the forward-looking statement not to come

true."[55]  H.R. Conf. Rep. No. 104-369, * 44 (1995).

---

the cautionary statement must be relevant to the projection
and must be of a nature that the factor or factors could
actually affect whether the forward-looking statement is
realized.

The Conference Committee expects that the cautionary
statements identify important factors that could cause
results to differ materially-but not all factors.  Failure
to include the particular factor that ultimately causes the
forward-looking statement not to come true will not mean
that the statement is not protected by the safe harbor.  The
Conference Committee specifies that the cautionary
statements identify "important" factors to provide guidance
to issuers and not to provide an opportunity for plaintiff
counsel to conduct discovery on what factors were known to
the issuer at the time the forward-looking statement was
made.

The use of the words "meaningful" and "important factors"
are intended to provide a standard for the types of
cautionary statements upon which a court may, where
appropriate, decide a motion to dismiss, without examining
the state of mind of the defendant.  The first prong of the
safe harbor requires courts to examine only the cautionary
statement accompanying the forward-looking statement.
Courts should not examine the state of mind of the person
making the statement.

H.R. Conf. Rep. No. 104-369, * 44 (1995).

[55]  The April 24, 2002 conference call fits comfortably
within this framework.  Although plaintiffs complain that the
warnings in the conference call were simply boilerplate, the
warnings were specific, detailed and relevant to the projection.
Contrary to plaintiffs' position, the omission of the discounts
and inventory does not dispel the specificity of the warning and
prevent it from being sufficient under the PSLRA.  This is
particularly true where, as here, the warning refers the investor
to the company's SEC filings and the 2001 Form 10-K expressly
advised the investor about the company's use of discounts.  The
forward looking statements in the conference call therefore lie

The safe harbor provision also extends to oral statements in a less exacting manner.  It allows a company to rely on this safe harbor when making an oral statement by simply referring to the written document containing the cautionary language.  15 U.S.C. § 78u-5(c)(2); see H.R. Conf. Rep. No. 104-369, * 45 (1995).

The analogous "bespeaks caution" doctrine precludes liability for forecasts and projections where the context of the forecast bespeaks caution.  Shaw v. Digital Equipment Corporation, 82 F.3d at 1213-1214.  Under this doctrine, the forward looking statement is not materially misleading if "accompanied by adequate cautionary disclosures."  In Re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d at 162. Like the statutory safe harbor provision, the cautionary language under the bespeaks caution doctrine must be "'sufficiently related in subject matter'" as opposed to "merely boilerplate." In Re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d at 162.  Summarily stated, the doctrine "embodies the principle that when statements of 'soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the

---

within the safe harbor.
    Furthermore, although not argued or addressed by the parties, the conference call was an oral warning at the time it was given even though it is now reduced to a transcript.  As explained in the next paragraph, such oral statements do not require the level of specificity required for written statements. In any event, the warning is sufficient for either a written or oral forward looking statement.

'soft' statements may not be materially misleading under the securities laws."  Shaw v. Digital Equipment Corporation, 82 F.3d at 1213.

     With the foregoing principles in mind, including the adequacy of the pleading under Rule 9(b) and the PSLRA, this court turns to the statements in the complaint.

     The July 25, 2001 statement that growth is "driven by our proven market strategy, best-in-class sales team, and superior technology" is not actionable due to the failure to articulate or establish a basis for the statement's false or misleading nature. See Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 300 (distinguishing the actionable fueling growth statement in In re Allaire Corporation Securities Litigation, 224 F.Supp.2d at 331-332).  Plaintiffs fail to allege that the market strategy or the sales team or the superior technology is not "without any positive impact on [Cytyc's] performance."  Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 299 (statement that credited "company's separation of business units and focus on product sales for Parametric's financial performance" as opposed to undisclosed improper revenue recognition deemed inactionable because "[p]urchasers . . . have not alleged that Parametric's strategic business decisions were without any positive impact on their performance").  Nowhere does the complaint particularize with the requisite specificity that Cytyc's growth was not assisted by the company's market strategy, sales team and superior technology.  See also Orton v. Parametric Technology

54

<u>Corporation</u>, 344 F.Supp.2d at 301-302 (statement that "we executed well this quarter" and "believe our strategic efforts in this past year in developing software solutions, expanding distribution and improving customer satisfaction are helping us to expand our leadership position as the product development company" lacked "requisite specificity" because "the plaintiffs have not alleged . . . that Parametric had executed its software development, product distribution, or customer service poorly").

Moreover, defendants correctly point out that the statement does not present an exhaustive list of all the reasons for the growth.  <u>See</u>, <u>e.g.</u>, <u>In Re Boston Technology, Inc. Securities Litigation</u>, 8 F.Supp.2d at 69 ("paragraph B is not reasonably construed to attribute the shortfall to an exclusive cause, and it was therefore immaterial to the investment decision").  As noted by the court in <u>Polaroid</u>, "Statements discussing how some market factors (like mergers among retail drug chains) are affecting business are not false or misleading simply because they do not implicate other negative market influences as well." <u>In Re Polaroid Corporation Securities Litigation</u>, 134 F.Supp.2d 176, 185 (D.Mass. 2001).  Thus, the omission of the extensive end of quarter discounting does not render the statement materially misleading.  <u>See</u> <u>Gross v. Summa Four, Inc.</u>, 93 F.3d at 992 (revealing one fact about a product does not require corporation to "reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to

mislead'")

The statement is also inactionable corporate puffery.  See,
e.g., Fitzer v. Security Dynamics Technologies, Inc., 119
F.Supp.2d at 24 (classifying as puffery statement that "Our
eleventh straight quarter of record revenues is the result of
continued market demand for our enterprise network and data
security solutions").  Indeed, it is strikingly similar to the
following statement in Orton that the court considered puffery:
"Although we are not immune to the weakening economy in the
near-term, we feel confident that the combination of our
motivated workforce, solid infrastructure and total commitment to
product development which is intended to deliver a high return on
investment for customers, positions us for long-term growth."
Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 300
(discounting statement as puffery and not "material to any
reasonable analysis of the company's prospects").  The court in
Orton rejected the foregoing statement as puffery against the
contention that the statement failed to disclose that "long-term
growth was unlikely because of Parametric's improper recognition
of revenue in earlier periods."  Orton v. Parametric Technology
Corporation, 344 F.Supp.2d at 300.  The other portions of the
statement pertaining to the continuation of "momentum" and the
company's "consistent quarter to quarter growth" is likewise mere
puffery and sales talk.  See, e.g., In Re Parametric Technology
Corporation Securities Litigation, 300 F.Supp.2d at 220-221
(characterizing as puffery statements that company was "well

56

positioned for growth" and that it "expects more revenue growth in opportunities in Asia in the coming years").[56]

The same reasoning applies to the similar statements in the August 2, 2001 Bloomberg news article.  When asked how Sullivan would increase or aggressively gain market share, Sullivan lists Cytyc's "unique sales and marketing strategy" as "creating the demand at the physician's office."  (¶ 73).  Although the complaint adequately pleads the time, place and content of the communication, the statement itself is not false or misleading. Like the July 25, 2001 statement, the list is not exhaustive or otherwise materially false or misleading.  There is no indiction that the direct sales force was not creating, at least in part, the demand.  In addition, the nondisclosure of the use of discounts did not significantly alter the total mix of information inasmuch as the 2000 Form 10-K filing discloses the use of such discounts.  Alternatively, the self directed comment is puffery as is Sullivan's mildly optimistic prediction about the company's ability to maintain similar growth ("We believe so") (¶ 73).[57]

In the interview, however, Sullivan also quantifies revenue projections.  (¶ 75).  The quantification provides sufficient

---

[56]  As explained _infra_ with respect to these and other statements, the omission of the deep discounting at Cytyc falls significantly short of reckless when placed in context and the complaint as a whole fails to demonstrate a strong inference of scienter.

[57]  Like the July 25, 2001 comments, this court's decision obviates the need to address the applicability of the PSLRA's safe harbor provision to these comments.

specificity to avoid defendants' assertions of puffery.
Sullivan's revenue projections in the interview, bereft of
cautionary language or a reference to document[s] identified as
containing cautionary statements,[58] do not fall within the reach
of the safe harbor provision or the bespeaks caution doctrine.
See 15 U.S.C. § 78u-5(c)(2); H.R. Conf. Rep. No. 104-369, * 45
(1995) ("Companies who want to make a brief announcement of
earnings or a new product would first have to identify the
statement as forward-looking").

Contrary to defendants' position that the information does
not alter the total mix of information, the forecast gives a
specific range for 2002 revenues.  Cf. Suna v. Bailey
Corporation, 107 F.3d at 70 (discounting projections as not
actionable in part because they "do not project specific numbers
that the company will certainly attain").  Projections and the
company's ability to meet financial targets are "certainly
material to any sensible evaluation of [a] company's
performance."  Orton v. Parametric Technology Corporation, 344
F.Supp.2d at 302.  Theoretically, the projection was materially
misleading when made because the preexisting and continuous deep
discounting and over-stuffing of customers would prevent Cytyc
from meeting the forecast.  Existing revenue growth was achieved
at the expense of future sales.  (¶ 82).

The issue therefore devolves into whether Sullivan had

---

[58]    Instead, during the televised exchange Sullivan simply
refers to a conference call.

information known to him at the time that would show that the anticipated or projected earnings for 2001[59] and/or 2002 were unlikely.  See generally Suna v. Bailey Corporation, 107 F.3d at 70.  This is where the complaint falters.  First, the complaint fails to plead sufficient facts to support the information and belief that Sullivan knew that the projection was false when made.  See 15 U.S.C. § 78u-4(b)(1).  The facts alleged fail to adequately show that Sullivan had knowledge of specific facts regarding the channel stuffing and the magnitude or extent of the end of quarter discounting in August 2001 that would make Sullivan's projection unreasonable.  See In Re Boston Technology, Inc. Securities Litigation, 8 F.Supp.2d at 54 ("Absent bad faith, a defendant must have had--at the time the statement was made--knowledge of specific facts making the statement unreasonable"); see also Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d at 361.  Furthermore, under the facts alleged there is absolutely no bad faith or intentional deception reasonably inferred.

Sullivan also had no knowledge that the projection was materially misleading.  See Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d at 361 (under Rule 9(b), "complaint must set forth 'specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading'").  To the contrary, there was little reason to

---

[59]  Cytyc met the 2001 projection.  (¶¶ 96 & 115).  This is true with respect to both the earnings projection on August 2, 2001 and on January 14, 2002.

believe that the failure to disclose the discounting was materially misleading and would alter the total mix of information inasmuch as the 2000 Form 10-K already disclosed the use of discounts. Similarly, there was no duty to disclose the discounting under the circumstances. The projection is therefore not actionable under the facts alleged.[60]

Sullivan's equally glowing repetition of 2002 projected earnings on January 14, 2002, as "approximately $0.64 to $0.66" (¶ 95) is not puffery but nonetheless fails for identical reasons. It is true that the complaint notes that the continuous channel stuffing was and would continue to have an adverse impact on future sales and/or the market share was overstated because of the channel stuffing, not to mention that customers were ceasing to do business with Cytyc because of such practices. (¶ 100). The complaint fails, however, to provide facts to support the information and belief regarding Sullivan's knowledge that the projection was false or misleading when made. In any event, the strong inference of scienter is notably absent.[61]

_____

[60] Alternatively, as discussed <u>infra</u>, there is an absence of a strong inference of scienter.

[61] The January 14, 2002 press release contains an adequate cautionary proviso that the projections are forward looking statements and sufficiently warns investors of the risks, including those identified in the 2000 Form 10-K filing. Consequently, although defendants neglect to expressly rely on the safe harbor provision or the bespeaks caution doctrine as applied to this statement, it is highly likely that the statement is not actionable. Given the absence of an explicit argument to this effect, however, this court rests its decision with respect to this statement on the conclusion that plaintiffs fail to plead a strong inference of scienter. Defendants present the scienter argument (as well as the corporate puffery, materiality and Rule

The October 19, 2001 comment by Sullivan that the company feels "confident in our success based on our track record" with ThinPrep is sales talk.  See, e.g., In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 217 (statement that "we continue to have confidence in the fundamental strength of our business and in our strong competitive position" considered puffery); Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 24 (classifying as puffery statement that, "There are very few companies that are positioned as well as us and have the track record, the experience and the management").  Unaccompanied by any specifics regarding the company's "track record," see Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 24 (finding phrase "continued market demand" vague inasmuch as it failed to "specify a particular market demand [or] a market share figure"), no reasonable investor would consider the statement material to an investing decision.

For the same reasons that apply to the July 25, 2001 statement, the strikingly similar statement in the October 24, 2001 press release ("We believe the superior clinical performance of the ThinPrep Pap Test and the effectiveness of our sales and marketing strategy have provided Cytyc with consistent revenue and earnings growth and financial performance") is not actionable.  The statement does not purport to identify all of

9(b)/PSLRA pleading shortcomings) universally as applied to all the allegations in the complaint.  (Docket Entry # 31, § Introduction & § I(C)(2)).

the factors effecting growth and performance.  Alternatively, for reasons expressed with respect to the July 24, 2001 statement, the statement amounts to puffery.  See, e.g., Suna v. Bailey Corporation, 107 F.3d at 70 ("While the company states that it *believes* [emphasis supplied] the opportunities will be comparable, the statement contains no promise to that effect").

Plaintiffs next challenge in a January 23, 2002 press release that Cytyc had "now reported fifteen consecutive quarters of revenue growth."  (¶ 96).  Although plaintiffs contend and plead that the statement is false because of the failure to disclose the channel stuffing which numerous former employees articulate, the statement was an accurate portrayal of past and present earnings.  It was not false.  Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d at 361 & n. 4 ("defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy").  As to the misleading nature of the statement, defendants had no duty to disclose the channel stuffing with respect to this statement. The omitted disclosure of channel stuffing did not cause what Sullivan did say, to wit, 15 past quarters of growth, to be misleading.  See Shaw v. Digital Equipment Corporation, 82 F.3d at 1212 ("reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse").  In contrast to a similar statement deemed actionable in Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302 ("we met

62

the third quarter targets we set in April"),[62] plaintiffs cannot, as explained supra, empirically show that Cytyc did not meet the earnings for the quarters in violation of the cited regulatory provisions and the company's revenue recognition policy.  Cf. Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302 (above statement actionable because, in theory, "the Purchasers could empirically disprove Harrison's statement by demonstrating that Parametric did not actually meet the financial targets set in April under GAAP and under the company's own accounting policies").

The remaining objectionable portion of the statement ("We believe the achievements of 2001 put Cytyc in a solid position to build on the momentum of the past year") is puffery.  See, e.g., Suna v. Bailey Corporation, 107 F.3d at 70 ("While the company states that it *believes* [emphasis supplied] the opportunities will be comparable, the statement contains no promise to that effect"); Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302 (after stating that company met the target for the April quarter, the further statement that "[s]olid execution of our cost reduction programs and consistent focus on our key initiatives will position us for enhanced earnings potential once the economy improves" was puffery); In Re Parametric Technology

_____

[62]  Like the entire objectionable portions of the January 23, 2002 statement, the statement in Orton reads in full as follows:  "[W]e met the third quarter targets we set in April . . . Solid execution of our cost reduction programs and consistent focus on our key initiatives will position us for enhanced earnings potential once the economy improves."  Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302.

Corporation Securities Litigation, 300 F.Supp.2d at 220-221 (characterizing as puffery statements that company was "well positioned for growth" and that it "expects more revenue growth in opportunities in Asia in the coming years").  Such general optimism regarding the elusive concept of "momentum" building for an indeterminable amount of time into the future is not actionable.

As already explained,[63] the forecast in the January 24, 2002 Bloomberg news interview ("$295 to $305 million" and earnings per share "of between 64 and 66 cents" for upcoming year) is not puffery but nonetheless fails to constitute an actionable statement.

Sullivan's additional statement that "we believe" that Cytyc could capture "100 percent of the market" is, to a large degree, so unrealistic that no reasonable investor would give it credence.  Put another way, a reasonable investor would not consider such a prophesy material to an investing decision.  It also amounts to inactionable corporate puffery.  See, e.g., Suna v. Bailey Corporation, 107 F.3d at 70; Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302; In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 220-221.  Alternatively, as explained in connection elsewhere, the statement is not actionable because of the absence of a strong inference of scienter.

Plaintiffs next identify various statements in the April 24,

---

[63]    See footnote number 22.

2002 press release and conference call as actionable.  The forward looking statements (see, e.g., ¶ 118; ¶ 119, 2002 revenues) fall easily within the parameters of the PSLRA's safe harbor.[64]

The historical recitation of earnings in the April 24, 2002 press release (¶ 117), without more, was not false.[65]  The statement also did not give rise to a duty to disclose the deep discounts or channel stuffing and was therefore not misleading. The press release did not present the statement of past earnings as a basis to forecast future growth but, instead, advised that Cytyc management would discuss future expectations at the conference call.  See Shaw v. Digital Equipment Corporation, 82 F.3d at 1212 ("reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse").

The tightening inventory statement is not actionable for a number of reasons.  First, the statement (¶¶ 119 & 124) fails the so-called "entanglement test."  Under this test, recently adopted by the First Circuit, "liability may attach to an analyst's statements where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the

---

[64]  See footnote 55.

[65]  To the extent the market share (¶¶ 47, 68, 82, 90, 100, 102, 109 & 117) or conversion rate stated at various times in the complaint was not accurate (see, e.g., ¶ 127), there is an absence of a strong inference of scienter.

statements, or have otherwise entangled themselves with the analysts to a significant degree."  In Re Cabletron, 311 F.3d at 37-38; accord Stone & Webster, Inc. Securities Litigation, 253 F.Supp.2d at 113 (same).[66]  Second, the conclusory assertions that defendants intended analysts to rely upon and repeat various statements (¶ 76), that the company provided guidance to analysts and that the company used analysts, as a conduit to provide false and misleading information (¶¶ 167-172) do not satisfy Rule 9(b). See Stone & Webster, Inc. Securities Litigation, 253 F.Supp.2d at 113 ("Suna also rejects the notion that general statements regarding a company's 'practice' of 'communicat[ing] regularly with securities analysts . . . and [of] provid[ing] detailed "guidance" to these analysts' are sufficiently particularized to survive a motion to dismiss" under Rule 9(b)).  The article itself does not quote a company source or imply that Cytyc adopted the statements therein.  See, e.g., Suna v. Bailey Corporation, 107 F.3d at 74 (rejecting under 9(b) allegation attributing statements to company inasmuch as "reports do not appear to quote any Bailey officer or employee, nor do they imply that the forecasts were supplied or confirmed by any Bailey officer or employee").

The assertion that Cytyc falsely represented in the conference call that the inventory problem manifested itself "only in the first quarter of 2002" (¶ 125) or that, as reflected

---

[66]  Plaintiffs' reliance on Stone & Webster (Docket Entry # 36, p. 30) is misplaced for reasons set forth in defendants' reply (Docket Entry # 39, pp. 13-14).

in a UBS Warburg report, the company "'instituted a one-time promotion'" (¶¶ 121 & 122) is belied by the transcript.  See In Re Computervision Corporation Securities Litigation, 914 F.Supp. 717, 719 (D.Mass. 1996) (noting "fundamental and fatal defect[]" in securities fraud action that, with respect to the allegedly actionable statements, "the Company simply did not say what the plaintiffs say it said").  Sullivan explicitly stated that this was not the first time for company promotions.  The 2000 and 2001 Forms 10-K also both note the use of "discounts" (plural) "[i]n the past."  (Docket Entry # 32, Ex. B & J).

Having addressed various statements, this court turns to the issue of scienter or, more accurately, the absence thereof.

E.   Scienter

Having already defined the concept of scienter, this court simply notes that there is no one fact pattern that predominates the calculus.  Instead, the fact pattern presented in each individual case is analyzed to determine if the allegations are sufficient to support a strong inference of scienter.  Geffron v. Micrion Corporation, 249 F.3d at 36 ("this Court does not 'categoriz[e] patterns of facts as acceptable or unacceptable to prove scienter,' but instead 'analyze[s] the particular facts alleged in each individual case to determine whether the allegations [are] sufficient to prove scienter'"); Greebel v. FTP Software, 194 F.3d at 196.

What consistently strikes this court in reading and rereading the complaint and other relevant and properly

considered documents is the absence of the strong inference of scienter now required under the PSLRA.  First, there is nothing inherently wrong with discounts or pressing for sales to be made in earlier quarters or at the end of a quarter.  Greebel v. FTP Software, 194 F.3d at 202 ("[t]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course");[67] accord Johnson v. Tellabs, Inc., 262 F.Supp.2d 937, 950 (N.D.Ill. 2003) ("[i]n the business world, there certainly is nothing inherently wrong with offering incentives to customers to purchase products").  Nor is there any additional suggestion of inventory parking, contingent sales or other improper activity.[68]

Second, throughout the class period, the company's SEC filings disclosed the use of discounts, albeit not to the degree plaintiffs insist was necessary.  Given the fact that Cytyc's public documents disclosed the use of discounts, i.e., the company's "channel stuffing practices," see In Re Segue Software,

---

[67] There is nevertheless a line between offering discounts or encouraging earlier than normal sales versus knowingly hiding low earnings in the earlier quarters by artificially inflating revenues through improper revenue recognition.  See Greebel v. FTP Software, 194 F.3d at 202; accord In Re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d at 149.  The latter provides a weak inference of scienter.  Greebel v. FTP Software, 194 F.3d at 202-203; accord In Re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d at 149-150.  Given the absence of improper revenue recognition, even this weak inference is missing.

[68] The three cases outside this circuit prominently cited by plaintiffs (Docket Entry # 36, pp. 1-2) are distinguishable for reasons stated by defendants in their reply memorandum (Docket Entry # 39, pp. 3-4 & n. 2) and eloquently expressed at the hearing.

Inc. Securities Litigation, 106 F.Supp.2d at 168 (allegation of improperly booking contingent sale to boost revenue and not disclosing the right of return in the large and identified million dollar sale to named customer not fraudulent given the Form 10-K disclosure);[69] see also Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 35-36 (finding list prices in Form 10-K not fraudulent inasmuch as the disclosure was made that the prices were "[s]ubject to volume discounts and other licensing terms and conditions"), the record fails to reflect a strong inference that defendants knew that the statements were false or materially misleading by omitting the information regarding the extent of the discounting at Cytyc.  See Geffon v. Micrion Corporation, 249 F.3d at 36 ("[e]ven if the statements at issue were material and false or misleading, the evidence does not support a finding that defendants knew the statements would materially mislead the investing public").  Indeed, during the April 24, 2002 conference call, Sullivan forthrightly sought to provide investors with the information that this was not the first time the company had used promotions.  See Geffon v.

---

[69]  Indeed, the disclosure in the Form 10-K in Segue was even less forthcoming that the ones in the case at bar.  In Segue, the Form 10-K affirmatively stated the contrary, to wit, that, "The Company typically does not grant to its customers a contractual right to return software products."  In Re Segue Software, Inc. Securities Litigation, 106 F.Supp.2d at 168.  The form then gave the impression that rights of return were the exception and not contained in typical, if any, contracts with customers.  The relevant language was that, "When approved by management, however, the Company has accepted returns of certain software products and has provided an allowance for those specific products."  In Re Segue Software, Inc. Securities Litigation, 106 F.Supp.2d at 168.

Micrion Corporation, 249 F.3d at 37 (noting that "Micrion sought to provide investors with adequate warnings of the possibility that not all seventy-five units would be purchased").

Third, as already explained, the allegations of insider trading and revenue recognition or accounting violations lack merit.  Although insider trading may provide evidence of scienter, see Greebel v. FTP Software, 194 F.3d at 196 (noting the "many different types of evidence as relevant to show scienter," including insider trading), the inference is nonexistent in the case at bar.  Bowen never traded during the class period.  Sullivan's trading was less during the class period than prior to or after the class period.  Likewise and also as previously explained, violations of GAAP, SEC or company policy may give rise to an inference of scienter, see Aldridge v. A.T. Cross Corporation, 284 F.3d at 83 ("'accounting shenanigans' may be evidence of scienter"); In Re Cabletron, 311 F.3d at 39 ("[s]ignificant GAAP violations also 'could provide evidence of scienter'"); In Re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d at 266 ("'a violation of a company's own policies supports an inference of scienter'"), but the record is devoid of any such violations.

Defendants' alleged motive to inflate the stock price and use the inflated price to purchase Pro-Duct and Digene at more attractive prices is unconvincing.  See, e.g., In Re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d at 270 ("the mere statement that an acquisition occurred after Galileo's stock

prices increased is insufficient even to create an inference that the two events were necessarily related, not to mention insufficient to create a strong inference either of an intent to deceive or of recklessness").  Sullivan and Bowen's involvement in discussing sales strategies, knowledge of daily activities, positions in the company, setting and encouraging unrealistic sales quotas, general access to internal information and/or focus upon the company's stock price (¶¶ 39-41, 46-47, 144, 147-151 & 153-154) are also equally unconvincing.  See Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d at 254 (rejecting "knowledge derived by Sims and Toscanini from unspecified plans, budgets, forecasts, reports, conversations, connections, meetings and 'other' information to which these defendants had access because of their positions with CTP" as adequate to plead scienter); Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 25 (declining to "speculate that because former employees in the corporation knew of changes in the sales profiles, the corporate executives must also have known about the changes and fraudulently concealed them"); Lirette v. Shiva Corporation, 27 F.Supp.2d at 283 ("[a]ttempts to plead scienter by general allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss"); In Re Viewlogic Systems Securities Litigation, 1996 U.S.Dist. Lexis 22371 at * 37-39 (D.Mass. March 13, 1996); see also Maldonado v. Dominquez, 137 F.3d 1, 9-10 (1st Cir. 1998).

In sum, there is a marked void of the necessary strong

inference of scienter.  Finally, lacking a predicate violation of section 10(b) of the Securities Exchange Act of 1934 or of Rule 10b-5, 17 C.F.R. § 240.10b-5, the section 20(a) claim is also subject to dismissal.  See Suna v. Bailey, 107 F.3d at 72; In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 224.

Defendants seek a dismissal with prejudice.  In a footnote, however, plaintiffs summarily request leave to replead in the event this court "determines that there are efficiencies in the Complaint as to any of the named defendants."  (Docket Entry # 36, n. 26).  This court assumes plaintiffs meant to use the word "deficiencies."  As discussed, there are numerous deficiencies.

Although this case is rapidly approaching the three year mark, the PSLRA "stays all discovery, with certain narrow exceptions, during the pendency of any motion to dismiss."  In Re Cabletron, 311 F.3d at 33.  In analogous circumstances, the court in Guerra v. Teradyne, Inc., 2004 WL 1467065 (D.Mass. Jan. 16, 2004), recommended a dismissal without prejudice given the plaintiffs' footnote request for leave to replead.  Accordingly, the recommendation will be to dismiss without prejudice subject to allowing plaintiffs an opportunity to replead if there are grounds for such an amendment consistent with the rulings made in this opinion.[70]  See, e.g., Guerra v. Teradyne, Inc., 2004 WL

---

[70]  It is, of course, entirely in the province of the district judge as to the amount of time he wishes to allow plaintiffs to submit a motion to amend together with an attached proposed consolidated second amended complaint.  In the event plaintiffs chose to file a motion for leave to amend, this court

1467065 at * 28 (D.Mass. Jan. 16, 2004) (refusing to dismiss case with prejudice inasmuch as the plaintiffs asked to be given leave to replead in a footnote if the court dismissed the complaint).

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[71] that the motion to dismiss (Docket Entry # 30) be **ALLOWED** except to the extent that the dismissal be without prejudice subject to allowing plaintiffs an opportunity to replead consistent with the rulings made in this opinion.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

suggests that the proposed consolidated second amended complaint should clearly identify the newly added language and any omitted language.

[71] Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order. United States v. Escoboza Vega, 678 F.2d 378-379 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).